[No. S128248. July 3, 2006.]

JOHN B., Petitioner, v.
SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
BRIDGET B., Real Party in Interest.

## COUNSEL

Garrard & Davis, Donald A. Garrard; and Eric S. Multhaup for Petitioner.

No appearance for Respondent.

Grassini & Wrinkle, Maryann P. Gallagher and Roland Wrinkle for Real Party in Interest.

## OPINION

**BAXTER, J.**—This is a sad case. Bridget B., the plaintiff in the underlying action and real party in interest herein, is infected with the human immunodeficiency virus (HIV), the probable causative agent of acquired immune deficiency syndrome (AIDS). So is her husband, petitioner herein and defendant in the underlying action, John B.

Bridget alleges that John became infected with HIV first, as a result of engaging in unprotected sex with multiple men before and during their marriage, and that he then knowingly or negligently transmitted the virus to her. John, who now has full-blown AIDS, alleges in his answer that Bridget infected *him* and offers as proof a negative HIV test conducted in connection with his application for life insurance on August 17, 2000, six weeks before Bridget discovered she was infected with HIV.

This factual scenario raises a number of interesting questions: What duty does an HIV-positive individual have to avoid transmitting the virus? What level of awareness should be required before a court imposes a duty of care on an HIV-positive individual to avoid transmission of the virus? What responsibility does the victim have to protect himself or herself against possible infection with the virus? And who infected whom with HIV here? However, this case comes to us at an early stage, before any discovery has been conducted. The issue here is simply the extent to which Bridget may inquire into John's medical records and sexual conduct in order to confirm or refute her allegations that John knowingly or negligently infected her with HIV.

The proposed discovery treads on important statutory and constitutional privacy rights. To decide what discovery should be permitted, we must

balance Bridget's right to discover relevant evidence against John's right to privacy. After balancing these interests, the superior court overruled John's objections and authorized broad discovery into John's medical records as well as his sexual history over the past 10 years. The Court of Appeal granted John's petition for writ of mandate to the extent the discovery sought the identities of John's previous sexual partners and admissions concerning his "lifestyle," but otherwise denied relief.

■ We conclude that discovery should be further limited in light of John's negative HIV test on August 17, 2000, which restricts the window period of possible infection to the six months preceding the negative test. However, Bridget, on remand, may overcome this temporal limitation on discovery by offering some basis to question the accuracy or reliability of John's negative HIV test. We therefore affirm in part and reverse in part the judgment of the Court of Appeal and remand the matter for further proceedings.

## I. THE PLEADINGS

Bridget's complaint for damages alleges the following:

Plaintiff Bridget B. and defendant John B. met in September 1998 and began dating shortly thereafter. The couple became engaged in late 1999 and were married in July 2000. During this period, John represented to Bridget that he was healthy, disease-free, and monogamous. Indeed, it was John who insisted that the couple stop using condoms during intercourse. Based on John's representations, Bridget complied with his demand to engage in unprotected sex. In September 2000, however, Bridget began to suffer from exhaustion and high fevers.

On October 1, 2000, Bridget learned that she had tested positive for HIV. She was advised to undergo a second test and to have her husband tested as well. The second test confirmed that Bridget was HIV positive. John, too, was determined to be HIV positive. John's doctor told Bridget that she had "brought the HIV into the marriage." The doctor prescribed medications for John that made his viral load virtually undetectable. Bridget, on the other hand, was not offered treatment; she was informed that she had "had the illness for a long time." Bridget became depressed that she had infected her husband with this deadly disease.

In September 2001, John began telling others that Bridget had infected him with HIV. The next month, after defendant refused to continue his treatment, he became much sicker and developed sores on his face and scalp. Although he was diagnosed with AIDS, he refused all treatments and medications except those that treated the visible signs of the disease.

In November 2001, Bridget began to doubt that she had been the cause of defendant's infection. John responded by asking whether she was "accusing" him of bringing HIV into their lives and advised "it would not be healthy for their marriage to blame him." The following month, however, John admitted to Bridget that he had had sexual relations with men before their marriage. The complaint further alleges that John also engaged in sexual relations with men during their marriage and used the Internet to solicit these relationships.

The first cause of action (intentional infliction of emotional distress) alleges in material part that John knew he was HIV positive before he married Bridget and before he engaged in unprotected sexual relations with her, that he infected her with HIV knowingly and intentionally, and that he then falsely accused her of infecting him. It further alleges that Bridget was unaware that John had been unfaithful prior to and during their marriage, which put her at great risk for HIV, AIDS, syphilis, and other sexually transmitted diseases, and that she would not have engaged in unprotected sexual relations with him had she known of his infidelity.

The second cause of action (negligent infliction of emotional distress) alleges that John knew or had a reasonable belief that he had HIV, that he nonetheless engaged in unprotected sex with Bridget, and that his negligence caused her to become infected with HIV.

The third cause of action (fraud) alleges that John falsely represented that he did not have any communicable diseases, including HIV, AIDS, or syphilis; that Bridget engaged in unprotected sexual relations with John in reliance on those representations; and that John thereby infected her with HIV.

The fourth cause of action (negligence) incorporates the foregoing allegations and alleges that John owed Bridget a duty of care to disclose the fact that he was HIV positive, that he breached this duty, and that he thereby infected her with HIV.

John's answer denied every allegation in the complaint and alleged instead that "[i]f either party transmitted the HIV virus to the other, it was Plaintiff who transmitted the virus to the Defendant." The answer also asserted Bridget's comparative fault as a defense in that she had "intimate sexual relations with Defendant without using condoms or any other form of protection against the HIV virus or other sexually transmitted diseases." In a declaration attached to his motion for summary judgment, John stated that he had been tested for HIV in connection with a life insurance application on August 17, 2000, and was found to be negative. John further alleged that he did not discover he was HIV positive until October 13, 2000.

## II. Discovery Proceedings

As relevant here, Bridget's pretrial discovery included the service of special interrogatories and requests for admission concerning John's sexual history and his awareness of his HIV infection. Bridget also subpoenaed John's medical and employment records. John objected to each and every special interrogatory and request for admission and also filed motions to quash the subpoenas duces tecum. After plaintiff filed motions to compel responses to the interrogatories and requests for admission, the parties stipulated to the appointment of a discovery referee to hear the pending discovery motions and to make nonbinding recommendations. The referee recommended that John's objections be overruled and his motions to quash be denied. The superior court adopted the referee's recommendations.

John filed the instant petition for writ of mandate. The Court of Appeal issued an order to show cause and granted the petition as to four interrogatories and two requests for admission, but otherwise denied relief in a published opinion. Because the issue before us concerns the permissible scope of discovery propounded by Bridget, we describe with particularity the discovery requests in controversy and John's objections to them below.

### A. The Special Interrogatories

Bridget served special interrogatories that required John to state (1) the name, address, and telephone number of every man with whom he has had sexual relations in the last 10 years; (2) the date of his first sexual encounter with a man; (3) the date of his last sexual encounter with a man; (4) the name, address, and telephone number of every man with whom he has had unprotected sex in the last 10 years; (5) the date on which he first became aware he was HIV positive; (6) the date on which he first became aware he had AIDS; (7) the date on which he first told Bridget that he had engaged in unprotected sex with men; (8) the name, address, and telephone number of every HIV-positive man with whom he has had unprotected sex; (9) the name, address, and telephone number of every man who has AIDS and with whom he has had unprotected sex; (10) the number of sexual encounters with men he had in the five years prior to his relationship with Bridget; (11) the date of his last sexual encounter with a man prior to the date of his engagement to Bridget; (12) the date of every sexual encounter he had with a man between his engagement to Bridget and the wedding; and (13) the number of sexual encounters he has had with men since he first met Bridget.

John objected to each of these interrogatories as burdensome, oppressive, overly broad, and harassing, and claimed that they were an invasion of his right to privacy under the state and federal Constitutions. He also objected to

selected interrogatories as violative of the physician-patient privilege (Evid. Code, § 990 et seq.) and Health and Safety Code section 120975. In his responses, John disclosed only that he first discovered he had tested positive for HIV on October 13, 2000.

The Court of Appeal granted John's petition for writ of mandate as to interrogatories Nos. 1, 4, 8, and 9, which sought the identities of his previous sexual partners, and denied relief as to the rest. Bridget had asserted a need to discover the identities of these sexual partners on the ground that John might have told these persons he had HIV but, as the Court of Appeal observed, she offered "nothing to support the suggestion that John may have disclosed his condition at an undisclosed time to an undisclosed person."

B. *The Requests for Admission*

Bridget requested John to admit that (1) he had had unprotected sexual relationships with multiple men in the 10 years prior to meeting Bridget; (2) he never told Bridget before they were married that he had had any sexual relationships with men; (3) he had AIDS prior to the time he first had unprotected sex with Bridget; (4) he knew he had AIDS prior to the time he first had unprotected sex with Bridget; (5) he transmitted AIDS to Bridget; (6) he transmitted HIV to Bridget; (7) he never told Bridget, prior to the time he had unprotected sex with her, that he had had unprotected sexual encounters with men; (8) he knew that his lifestyle prior to the time that he met Bridget put him at risk of acquiring HIV; (9) he never told Bridget, prior to having unprotected sex with her, about his lifestyle of having unprotected sex with men; (10) he continued to have unprotected sexual relationships with men after he was married; (11) prior to his marriage, he hid his sexual relations with men from Bridget; (12) he knew he had a history of having unprotected sexual relations with men that put him at risk of acquiring HIV at the time he accused Bridget of infecting him with HIV; (13) he has AIDS; (14) he knew he had AIDS before he married Bridget; and (15) he hid his sexual relations with men from Bridget before the wedding.

John objected to each of these requests as burdensome, oppressive, overly broad, and harassing, and claimed that they were an invasion of his right to privacy under the state and federal Constitutions. He also objected to selected requests as violative of Health and Safety Code section 120975.

The Court of Appeal granted John's petition for writ of mandate as to requests Nos. 8 and 9, which referred to his "lifestyle," but denied relief as to the rest. The Court of Appeal determined that the word "lifestyle" was vague and ambiguous and, to the extent it suggested a sexual orientation, impermissibly intruded into John's zone of sexual privacy.

### C. *The Subpoenas of Medical and Employment Records and the Results of HIV Tests*

Bridget subpoenaed John's medical records, seeking the results of any HIV and AIDS tests, medical records concerning HIV and AIDS and treatment for those conditions, medical records concerning any and all sexually transmitted diseases since 1980, and medical records concerning any "treatment" he had received since 1980. Bridget also subpoenaed John's employment records from Universal Studios, including records "regarding his medical leave and the reasons therefor" and "any disability he was suffering from."

John filed a motion to quash the subpoenas on the grounds that the subpoenas were not supported by affidavits or declarations as required by Code of Civil Procedure section 1985, subdivision (b) or by good cause; that the records were privileged from discovery under the right to privacy in the state and federal Constitutions; that the records were additionally privileged from discovery under Health and Safety Code section 120975 and Evidence Code sections 994 and 1014; and that the subpoenas constituted harassment.

The referee recommended the motions to quash be denied but limited the discoverable medical records relating to treatment since 1980 to "those regarding treatment received 'for AIDS or HIV infection.' " The superior court adopted the referee's recommendation, and the Court of Appeal denied relief as to this part of the order.

### III. DISCUSSION

■ John asserts a number of reasons for limiting discovery of his sexual history and HIV status, including his constitutional right to privacy, but we first determine whether the requested discovery comports with statutory requirements. (See *Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 711 [21 Cal.Rptr.2d 200, 854 P.2d 1117]; *Vinson v. Superior Court* (1987) 43 Cal.3d 833, 838 [239 Cal.Rptr. 292, 740 P.2d 404].) " 'Under the discovery statutes, information is discoverable if it is unprivileged and is either relevant to the subject matter of the action or reasonably calculated to reveal admissible evidence.' " (*Schnabel, supra,* 5 Cal.4th at p. 711.) "Discovery may relate to the claim or defense of the party seeking discovery or of any other party to the action." (Code Civ. Proc., § 2017.010.) "In reviewing an order of a superior court granting discovery, we recognize at the threshold that 'the discovery statutes vest a wide discretion in the trial court in granting or denying discovery' and 'such exercise [of discretion] may only be disturbed when it can be said that there has been an abuse of discretion.' " (*Pacific Tel. & Tel. Co. v. Superior Court* (1970) 2 Cal.3d 161, 171 [84 Cal.Rptr. 718, 465 P.2d 854].)

The subject matter of this action concerns Bridget's allegation that John infected her with HIV. The gist of the four causes of action—intentional infliction of emotional distress, negligent infliction of emotional distress, fraud, and negligence—is that John represented to Bridget that he was monogamous and had no sexually transmitted diseases; that John made these representations to convince Bridget to engage in unprotected sex with him; that, contrary to these representations, John had not been monogamous and had knowledge, actual or constructive, that he was HIV positive; that John nonetheless had unprotected sex with Bridget without telling her that he was HIV positive; and that Bridget was unaware that John was HIV positive and had not been monogamous. In his defense, John denies infecting Bridget and asserts that if either party infected the other, Bridget infected *him*.

In light of these allegations, the special interrogatories and requests for admission at issue are within the statutory limits of discoverability. Bridget seeks to discover whether John has AIDS (request for admission No. 13); whether he infected her with HIV and AIDS (request for admission Nos. 5, 6); when John first became aware that he was HIV positive (special interrogatory No. 5); and when he first discovered that he had developed AIDS (special interrogatory No. 6; request for admission Nos. 3, 4, 14). For her claims concerning infliction of emotional distress, Bridget asked John to admit that he knew his sexual behavior had put him at risk of contracting HIV at the time he accused her of infecting him. (Request for admission No. 12.) To help establish that she had been justifiably ignorant of John's HIV status, Bridget propounded discovery designed to show that John did not tell her he had previously engaged in unprotected sex with men. (Special interrogatory No. 7; request for admission Nos. 2, 7, 11, 15.) Finally, Bridget sought to establish that John had infected her (and not the other way around) by asking John to admit that he had engaged in unprotected sex with men prior to meeting her and during their courtship, engagement, and marriage and by inquiring into the dates and numbers of these encounters. (Special interrogatory Nos. 2, 3, 10–13; request for admission Nos. 1, 10.)

Having determined that the discovery requests authorized by the Court of Appeal meet the statutory standard of discoverability, we proceed to consider John's specific objections.

A. *Whether Discovery Must Be Limited Because the Torts in the Complaint Require Proof That the Infected Individual Had Actual Knowledge of the Infection*

John does not deny he would be liable if he had actual knowledge he was infected with HIV and failed to disclose that fact to Bridget. However, he vigorously denies that he can be held liable if the evidence shows only that

he had *constructive* knowledge he was infected with HIV. He concludes, therefore, that discovery should be limited to those requests aimed at uncovering whether he had actual knowledge that he was infected with HIV. According to John, such knowledge can be established only by a positive HIV test from an accredited laboratory or a medical diagnosis of HIV or AIDS.

■ John's proposed limitation on discovery calls into question the scope of the torts alleged in the complaint, principally the fourth cause of action for negligent transmission of HIV. This court has not yet had occasion to consider the tort of negligent transmission of a sexually transmitted disease, but the tort is far from novel. Our sister jurisdictions have long imposed liability on individuals who have harmed others by transmitting communicable diseases. (See, e.g., *Berner v. Caldwell* (Ala. 1989) 543 So.2d 686, 688 ["For over a century, liability has been imposed on individuals who have transmitted communicable diseases that have harmed others"]; *Crowell v. Crowell* (1920) 180 N.C. 516 [105 S.E. 206, 208] ["it is a well-settled proposition of law that a person is liable if he negligently exposes another to a contagious or infectious disease"]; see generally 39 Am.Jur.2d (1999) Health, § 99, p. 549 ["The general principle is established that a person who negligently exposes another to an infectious or contagious disease, which such other thereby contracts, is liable in damages"].) In particular, courts throughout the United States have recognized a cause of action for the negligent transmission of sexually transmitted diseases. (E.g., *McPherson v. McPherson* (1998) 1998 ME 141 [712 A.2d 1043, 1045] [citing cases]; *Hamblen v. Davidson* (Tenn.Ct.App. 2000) 50 S.W.3d 433, 438 ["all the jurisdictions which have considered the issue"]; *Doe v. Johnson* (W.D.Mich. 1993) 817 F.Supp. 1382, 1389 [citing cases].) California appellate courts are in accord. (*Doe v. Roe* (1990) 218 Cal.App.3d 1538, 1543 & fn. 3 [267 Cal.Rptr. 564]; *Kathleen K. v. Robert B.* (1984) 150 Cal.App.3d 992, 996–997 [198 Cal.Rptr. 273].) We agree with these courts that "[t]o be *stricken with disease* through another's negligence is in legal contemplation as it often is in the seriousness of consequences, no different from *being struck with an automobile* through another's negligence." (*Billo v. Allegheny Steel Co.* (1937) 328 Pa. 97 [195 A. 110, 114].)

■ To prevail in an action for negligence, the plaintiff must demonstrate that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach proximately caused the plaintiff's injuries. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1145 [12 Cal.Rptr.3d 615, 88 P.3d 517].)

■ The existence of a legal duty is a question of law for the court. (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 237 [30 Cal.Rptr.3d 145,

113 P.3d 1159].) "As this court has explained, 'duty' is not an immutable fact of nature ' "but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' [Citations.] In California, the general rule is that all persons have a duty ' "to use ordinary care to prevent others being injured as the result of their conduct. . . ." ' (*Rowland v. Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561] (citations omitted); Civ. Code, § 1714.)" (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572–573, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].) Foreseeability of harm is a " 'crucial factor' " in determining the existence and scope of that duty. (*Delgado, supra*, 36 Cal.4th at p. 237.)

John concedes that a person who actually knows he or she is infected with a sexually transmitted disease based on a test from an accredited laboratory or a medical diagnosis has a duty to use ordinary care to see that the disease is not transmitted to others. The foreseeability of harm in such a circumstance is manifest. John also concedes the viability of the tort of negligent transmission of HIV. In his view, though, a duty under this tort exists only when the actor has actual knowledge of being HIV positive; constructive knowledge of the infection is insufficient.

Tellingly, neither John nor our dissenting colleagues have identified a single jurisdiction that has limited liability for negligent transmission of HIV or other sexually transmitted diseases only to those who have actual knowledge they are infected. Our sister states instead impose liability when the actor has knowledge, actual *or* constructive, of a sexually transmitted disease. (*Berner v. Caldwell, supra*, 543 So.2d at pp. 689–690 & fn. 4 [applying this standard to the transmission of herpes and noting that the same duty could be imposed for other sexually transmitted diseases, including AIDS]; *Meany v. Meany* (La. 1994) 639 So.2d 229, 236; *McPherson v. McPherson, supra*, 712 A.2d at p. 1046; *Deuschle v. Jobe* (Mo.Ct.App. 2000) 30 S.W.3d 215, 219; *M.M.D. v. B.L.G.* (Minn.Ct.App. 1991) 467 N.W.2d 645, 647 [liability for negligent transmission of herpes exists where boyfriend had history of genital sores but had not been diagnosed with herpes]; *Mussivand v. David* (1989) 45 Ohio St.3d 314 [544 N.E.2d 265, 270] ["We find the reasoning of these other jurisdictions persuasive"]; *Plaza v. Estate of Wisser* (1995) 211 A.D.2d 111 [626 N.Y.S.2d 446, 451–452] [allegations of decedent's actual and constructive knowledge he was infected with HIV was sufficient to withstand motion to dismiss claims of fraud and negligence]; *Hamblen v. Davidson, supra*, 50 S.W.3d at p. 439 [noting that "the majority of states who have addressed the issue" extend liability to those with actual or constructive knowledge of the sexually transmitted disease]; *Doe v. Johnson, supra*, 817 F.Supp. at p. 1391 [liability for negligent transmission of HIV includes those who "knew s/he was suffering symptoms associated with the HIV virus . . . or . . . knew of a prior sex partner who was diagnosed as having the HIV virus"]; accord, 65 C.J.S. (2000) Negligence, § 171, p. 503.)

■ Extending liability to those who have constructive knowledge of the disease, as these jurisdictions have done, comports with general principles of negligence. Indeed, the "very concept of negligence presupposes that the actor either does foresee an unreasonable risk of injury, or could foresee it if he conducted himself as a reasonably prudent person." (3 Harper et al., The Law of Torts (2d ed. 1986) § 16.5, p. 397; accord, Prosser & Keeton on Torts (5th ed. 1984) § 32, pp. 182–185; Rest.2d Torts, §§ 289, 290; Nolte, *The Spoliation Tort: An Approach to Underlying Principles* (1994) 26 St. Mary's L.J. 351, 380 ["negligence law regularly utilizes the concept of constructive knowledge as the requisite notice"].) Because " '[a]ll persons are required to use ordinary care to prevent others being injured as a result of their conduct' " (*Rowland v. Christian, supra,* 69 Cal.2d at p. 112), this court has repeatedly recognized a cause of action for negligence not only against those who have actual knowledge of unreasonable danger, but also against those who have constructive knowledge of it. (See, e.g., *Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1210 [114 Cal.Rptr.2d 470, 36 P.3d 11]; *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253, 260, fn. 1 [74 Cal.Rptr.2d 878, 955 P.2d 504]; *Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814, 823 [59 Cal.Rptr.2d 756, 927 P.2d 1260]; *Garcia v. Superior Court* (1990) 50 Cal.3d 728, 735 [268 Cal.Rptr. 779, 789 P.2d 960]; *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 407 [185 Cal.Rptr. 654, 650 P.2d 1171].) Neither John nor our dissenting colleagues have pointed to any indication that the Legislature intended a lesser duty to apply to HIV.

Moreover, limiting tort defendants to those who have actual knowledge they are infected with HIV would have perverse effects on the spread of the virus. If only those who have been tested are subject to suit, there may be "an incentive for some persons to avoid diagnosis and treatment in order to avoid knowledge of their own infection." (Gostin & Hodge, *Piercing the Veil of Secrecy in HIV/AIDS and Other Sexually Transmitted Diseases: Theories of Privacy and Disclosure in Partner Notification* (1998) Duke J. Gender L. & Pol'y 9, 40.) Extending liability to those with constructive knowledge of the disease, on the other hand, "will provide at least a small incentive to others to use proper diagnostic techniques and to alter behavior and procedures so as to limit the likelihood of HIV transmission." (Hermann, *Torts: Private Lawsuits about AIDS* in AIDS and the Law: A Guide for the Public (Dalton & Yale AIDS Law Project edits., 1987) p. 172 (Hermann).) Justice Moreno offers no support for his view that tort liability would have no effect on human behavior in this context.

It must be noted, though, that "constructive knowledge," which means knowledge "that one using reasonable care or diligence should have, and therefore is attributed by law to a given person" (Black's Law Dict. (7th ed. 1999) p. 876), encompasses a variety of mental states, ranging from one who

is deliberately indifferent in the face of an unjustifiably high risk of harm (see *Farmer v. Brennan* (1994) 511 U.S. 825, 836–840 [128 L.Ed.2d 811, 114 S.Ct. 1970]) to one who merely should know of a dangerous condition (see *Ortega v. Kmart Corp., supra,* 26 Cal.4th at pp. 1208–1209). At this early stage, when no facts have yet been developed, the issue is not which of these mental states is required for the tort of negligent transmission of HIV, but what is permissible discovery for a party seeking to prove such a tort. In determining whether the requested discovery satisfies statutory requirements, therefore, we should recognize a duty no broader than is necessary to resolve the current discovery dispute.

■ In this case, we conclude that the tort of negligent transmission of HIV does not depend solely on actual knowledge of HIV infection and would extend at least to those situations where the actor, under the totality of the circumstances, has *reason to know* of the infection. Under the reason-to-know standard, "the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists." (Rest.2d Torts, § 12, subd. 1.) In other words, "the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist." (*Id.,* § 12, com. a, p. 20.)[1]

■ Imposing liability for the transmission of HIV where the actor knows or has reason to know he or she is HIV positive is consistent with the general principle of California law that " '[a]ll persons are required to use ordinary care to prevent others being injured as the result of their conduct.' " (*Rowland v. Christian, supra,* 69 Cal.2d at p. 112.) "Although it is true that some exceptions have been made to the general principle that a person is liable for injuries caused by his failure to exercise reasonable care in the circumstances, it is clear that in the absence of a statutory provision declaring an exception to the fundamental principle enunciated by section 1714 of the Civil Code, no such exception should be made unless clearly supported by public policy." (*Ibid.*; see also *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1077 [60 Cal.Rptr.2d 263, 929 P.2d 582] (*Randi W.*).)

---

[1] We note that the Proposed Final Draft of section 18, subdivision (a) of the Restatement Third of Torts, Liability for Physical Harm, imposes a duty to warn or to adopt further precautions if "the defendant knows or has reason to know" of the risk and "that those encountering the risk will be unaware of it." Included in the examples of the "range of defendant conduct that can give rise" to this duty is "the defendant who is about to come into intimate contact with the plaintiff . . . for failing to warn the plaintiff that the defendant suffers from a communicable disease." (Rest.3d Torts, Liability for Physical Harm (Proposed Final Draft No. 1, Apr. 1, 2005) § 18, com. a, p. 247.)

"Before judicially establishing an exception based on public policy, [we] consider a variety of factors; 'the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' [Citations.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

 An analysis of these factors does not justify a departure from the general rule in this instance. The factor that " 'plays a very significant role in this calculus' " (*Randi W., supra,* 14 Cal.4th at p. 1077) is the foreseeability of the particular harm, which (like the reason-to-know standard) is assessed by an objective test. (See *id.* at pp. 1077–1078.) When the actor has reason to know of the HIV infection—i.e., when there is sufficient information to cause a reasonably intelligent actor to infer he or she is infected with the virus or that infection is so highly probable that his or her conduct would be predicated on that assumption—the potential for harm through sexual transmission of the virus is reasonably foreseeable. As to causation, Bridget has plausibly alleged that John infected her during unprotected sex. (See *id.* at p. 1078.) Whether John's conduct is morally blameworthy will depend on the evidence uncovered during discovery, but it is certainly arguable that failing to exercise due care to prevent the transmission of a gravely serious disease of which the actor knows or has reason to know falls in that category. (*Ibid.*)

Moreover, society has an overriding policy of preventing the spread of sexually transmitted diseases (see Health & Saf. Code, § 120290), especially HIV (see, e.g., Health & Saf. Code, § 120291), which would be enhanced by imposing a duty of care on those who have reason to know they are infected with HIV. The burden of a duty of care on defendants who know or have reason to know of their HIV infection is minimal, and the consequences for the community would be salutary. (Cf. Health & Saf. Code, § 121015, subd. (a) [permitting physicians and surgeons to disclose to "a person reasonably believed to be the spouse, or to a person reasonably believed to be a sexual partner or a person with whom the patient has shared the use of hypodermic needles, . . . that the patient has tested positive on a test to detect HIV infection, except that no physician and surgeon shall disclose any identifying information about the individual believed to be infected"].) Indeed, limiting liability only to those who have actual knowledge they are infected would discourage those who fear they may be infected from getting tested, which would be contrary to the public policy of encouraging testing for and preventing the spread of HIV and thwart the effectiveness of new treatments that depend on early diagnosis of the virus.

In sum, none of the factors above justifies a departure from the general negligence rule imposing a duty on those who have actual or constructive knowledge of a dangerous condition. At the same time, we are mindful that our precedents direct us to consider whether a duty of care exists " 'on a case-by-case basis.' " (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472 [63 Cal.Rptr.2d 291, 936 P.2d 70].) Accordingly, our conclusion that a claim of negligent transmission of HIV lies against those who know or at least have reason to know of the disease must be understood in the context of the allegations in this case, which involves a couple who were engaged and subsequently married; a defendant who falsely represented himself as monogamous and disease-free and insisted the couple stop using condoms; and a plaintiff who agreed to stop using condoms in reliance on those false representations. We need not consider the existence or scope of a duty for persons whose relationship does not extend beyond the sexual encounter itself, whose relationship does not contemplate sexual exclusivity, who have not represented themselves as disease-free, or who have not insisted on having sex without condoms.

The discovery Bridget has requested comports with the reason-to-know standard. Evidence that John engaged in unprotected sex outside the relationship during the relevant period and hid these encounters from Bridget, even if insufficient to *establish* the requisite knowledge for a negligence claim, might reasonably lead to the discovery of evidence as to John's awareness of the HIV status of those partners—without even disclosing their identities, contrary to Justice Werdegar's assumption—and thus may be relevant to whether John knew or had reason to know he was infected with HIV. (*Doe v. Johnson, supra,* 817 F.Supp. at pp. 1395–1396.) Similarly, evidence that John had symptoms consistent with HIV infection may be insufficiently distinctive to indicate HIV infection by itself but may be relevant to whether John knew or had reason to know he was infected when considered in combination with his alleged history of engaging in unprotected sex outside the relationship.

John fails to consider whether the requested information, even if insufficient to establish the requisite knowledge by itself, may be relevant to the existence of such knowledge or reasonably calculated to lead to evidence on that point. He (like our dissenting colleagues) argues instead that the framework for other sexually transmitted diseases ought not be applied to HIV, but does not offer persuasive bases for distinguishing HIV from the other diseases. After careful analysis of John's argument, we cannot agree that persons who have reason to know they are infected with HIV, a gravely serious disease with no known cure, should be subject to a lesser duty of care than persons who have reason to know they are infected with other sexually transmitted diseases.

John contends that because carriers of HIV may be asymptomatic, possible symptoms of HIV (other than those distinctively and idiosyncratically associated with the virus, such as Kaposi's sarcoma), are irrelevant. But merely because "[m]any people who are infected with HIV do not have any symptoms at all for many years"[2] does not mean that plaintiffs are barred from discovering whether a particular defendant *did* have unique or diffuse symptoms and whether those symptoms, singly or in combination with other factors, gave the defendant reason to know he or she was infected with HIV. Many sexually transmitted diseases—such as chlamydia,[3] gonorrhea,[4] syphilis,[5] herpes,[6] and human papillomavirus (HPV)[7]—likewise commonly present asymptomatically at the initial stages or have nonspecific symptoms that can be confused with other, more common diseases. Yet, we have been pointed to no decision that has invoked the possible difficulties of establishing the requisite knowledge of these diseases in *some* instances as a justification for categorically foreclosing recovery in *all* cases. To the contrary, courts here and elsewhere have regularly found negligence when the evidence *does* show the defendant knew or had reason to know of infection with these sexually

---

[2] United States Department of Health and Human Services, Centers for Disease Control and Prevention (CDC), HIV/AIDS Prevention in the United States, FAQ: How can I Tell if I'm infected with HIV?, at <http://www.cdc.gov/hiv/pubs/faq/faq5.htm> (as of July 3, 2006).

[3] "Chlamydia is known as a 'silent' disease because about three quarters of infected women and about half of infected men have no symptoms." (CDC, Sexually Transmitted Diseases, Chlamydia—CDC Fact Sheet, at <http://www.cdc.gov/std/Chlamydia/STDFact-Chlamydia.htm> [as of July 3, 2006].)

[4] "Although many men with gonorrhea may have no symptoms at all, some men have some signs or symptoms that appear two to five days after infection; symptoms can take as long as 30 days to appear. . . . [¶] In women, the symptoms of gonorrhea are often mild, but most women who are infected have no symptoms. Even when a woman has symptoms, they can be so non-specific as to be mistaken for a bladder or vaginal infection." (CDC, Sexually Transmitted Diseases, Gonorrhea—CDC Fact Sheet, at <http://www.cdc.gov/std/gonorrhea/STDFact-gonorrhea.htm> [as of July 3, 2006].)

[5] "Many people infected with syphilis do not have any symptoms for years." "It has often been called 'the great imitator' because so many of the signs and symptoms are indistinguishable from those of other diseases." (CDC, Sexually Transmitted Diseases, Syphilis—CDC Fact Sheet, at <http://www.cdc.gov/std/Syphilis/STDFact-Syphilis.htm> [as of July 3, 2006].)

[6] "Most people infected with HSV-2 [herpes simplex virus type 2] are not aware of their infection. . . . [T]hey may have very mild signs that they do not even notice or that they mistake for insect bites or another skin condition." (CDC, Sexually Transmitted Diseases, Genital Herpes—CDC Fact Sheet, at <http://www.cdc.gov/std/Herpes/STDFact-Herpes.htm> [as of July 3, 2006].)

[7] "Most HPV infections have no signs or symptoms; therefore, most infected persons are unaware they are infected, yet they can transmit the virus to a sex partner." (CDC, Sexually Transmitted Diseases, Genital HPV Infection—CDC Fact Sheet, at <http://www.cdc.gov/std/HPV/STDFact-HPV.htm> [as of July 3, 2006].)

transmitted diseases. John fails to explain why Bridget should be precluded from discovering whether he harbored such knowledge in this case.[8]

John also complains that the risk of transmission of HIV in any individual act of intercourse is so low as to make it unreasonable to impose a duty of care on someone who is not actually aware he or she is infected. We disagree. A low risk of transmission is insufficient to relieve the infected individual of a duty where the harm itself is great and the duty of care to prevent that harm is not onerous. (See *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57 [192 Cal.Rptr. 857, 665 P.2d 947]; Prosser & Keeton on Torts, *supra*, § 31, p. 171 ["[a]s the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution"].) The AIDS epidemic was and continues to be one of the most dangerous of the modern era, killing over half a million Americans as of the end of 2003. Despite the introduction of antiretroviral therapy, AIDS remains the fifth leading cause of death among those ages 25 to 44. Sadly, HIV mortality declines have slowed while, at the same time, AIDS diagnoses have risen. (The Henry J. Kaiser Family Foundation, HIV/AIDS Policy Fact Sheet: The HIV/AIDS Epidemic in the United States (Sept. 2005) p. 1 at <http://www.kff.org/hivaids/3029-05.cfm> [as of July 3, 2006].) The medical advances in combating HIV do not relieve infected individuals of their duty to avoid transmitting what remains a very serious disease, nor should the efficacy of those advances necessarily determine what discovery is permissible.

The dissenting opinions' effort to narrow the duty of care for persons infected with HIV is similarly unconvincing. Justice Moreno contends that the general analytic framework of negligence cannot apply here because HIV infection, unlike other sexually transmitted diseases, is "life-threatening."

---

[8] At oral argument, John abandoned our dissenting colleagues' contention that actual knowledge is an essential predicate to liability. He claimed instead that actual knowledge of HIV infection, as verified by a medical diagnosis or test, *or* constructive knowledge based on a very limited category of symptoms of HIV (namely, Kaposi's sarcoma) or a medical opinion was required before an individual could be liable for negligent transmission of HIV. He also urged the court to "lock in the duty" he described so as to avoid having to consider "constantly evolving medical and epidemiological information" concerning the disease.

Once again, John has failed to cite any legal authority for the limited duty he proposes. Nonetheless, his concession demonstrates the appropriateness of imposing liability on those who, under the totality of the circumstances, have reason to know they are infected. As stated earlier, it is premature to decide here which physical symptoms, considered in isolation or in combination with conduct reasonably likely to have resulted in the transmission of the virus, would support a finding of liability for negligent transmission of HIV. The question of duty depends on the facts of a particular case, including available medical and epidemiological information. This opinion does not purport to offer a primer on proving the tort of negligent transmission of HIV, but inquires only whether the discovery Bridget has requested is relevant to the tort or is reasonably calculated to lead to the discovery of admissible evidence. We therefore decline John's invitation to "lock in the duty" he has described.

(Dis. opn. of Moreno, J., *post*, at p. 1215.) The premise of his argument suffers from a factual flaw; other sexually transmitted diseases, such as syphilis and HPV, are also life-threatening. Moreover, the gravity of the harm from HIV infection is a justification for imposing a *greater* duty of care on those who are infected (see Prosser & Keeton on Torts, *supra*, § 31, p. 171; Rest.2d Torts, § 293, com. c, p. 59)—not, as Justice Moreno would have it, a basis for insulating those infected from responsibility for their conduct in transmitting the virus to others. Justice Moreno is also mistaken in assuming that HIV is "unique" (dis. opn. of Moreno, J., *post*, at p. 1215) in the opprobrium with which those infected are viewed. (See Note, *Liability in Tort for the Sexual Transmission of Disease: Genital Herpes and the Law* (1984) 70 Cornell L.Rev. 101, 107–108 ["The social stigma associated with genital herpes prompted one popular news magazine to label the disease the 'new scarlet letter' "].) In any event, Justice Werdegar and Justice Moreno fail at bottom to explain why the distinctions between HIV and other sexually transmitted diseases are so fundamental as to warrant wholesale rejection of ordinary tort principles in this case (cf. Hermann, *supra*, at p. 158 [in analyzing liability for sexual transmission of HIV, "there is clear precedent in the analogous area of transmission of genital herpes"]) or to identify any court that has summarily absolved infected individuals of any responsibility for negligently infecting an intimate partner with HIV.

Justice Moreno's contention that the Legislature, by criminalizing the intentional and knowing transmission of HIV, has evinced an intent to limit tort liability only to those individuals who have actual knowledge they are infected misapprehends the respective roles of criminal and tort law. That the Legislature "has not adopted a constructive knowledge standard in statutes criminalizing the transmission of AIDS" hardly "reflects a legislative judgment that a constructive knowledge standard is not appropriate for purposes of imposing [tort] liability for the transmission of HIV." (Dis. opn. of Moreno, J., *post*, at pp. 1221–1222.) After all, the Legislature typically intends a lowered standard be required for a civil suit to recover damages than for a prosecution imposing criminal penalties, especially where those penalties are substantial. For example, Health & Safety Code section 120291, which criminalizes the intentional and knowing transmission of HIV through unprotected sexual activity, is punishable by up to eight years in prison—but "conduct that is more, not less, culpable is required for imposition of criminal penalties." (*People v. Simon* (1995) 9 Cal.4th 493, 517 [37 Cal.Rptr.2d 278, 886 P.2d 1271].) "In the criminal context, 'ordinary negligence sufficient for recovery in a civil action will not suffice.' " (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 573 [20 Cal.Rptr.2d 341, 853 P.2d 507].) Thus, the fact the Legislature did not attach *criminal* penalties to those persons who have reason to know they carry HIV and nonetheless take no steps to avoid infecting others in no way suggests that the Legislature intended to depart

from Civil Code section 1714 or from ordinary negligence principles in a *civil* action for negligent transmission of HIV.[9]

The dissenting opinions' suggestion that the duty of individuals infected with HIV not to infect others—and not merely the permissibility of discovery aimed at uncovering their HIV status—has somehow been limited by the enactment of statutes protecting the confidentiality of HIV test results proves far too much, inasmuch as the cause of action under the actual-knowledge standard poses the same threat to the confidentiality of a defendant's HIV test results as does a cause of action under the reason-to-know standard. Indeed, Justice Moreno acknowledges that even an actual-knowledge standard would permit discovery "directed at whether and when defendant had actual knowledge he was HIV positive." (Dis. opn. of Moreno, J., *post*, at p. 1212.) The logical consequence of the dissenting opinions' reading of the statutory scheme, therefore, would be to eliminate entirely the possibility of tort liability for the knowing *or* negligent transmission of HIV, even when the discovery the plaintiff eventually seeks does not tread on statutory confidentiality. Had the Legislature intended to abrogate ordinary tort principles to such an extent, one would expect it to have expressed its intent more clearly.[10]

In any event, it is not necessary to consider here whether a conflict exists between Bridget's entitlement to discover relevant evidence and Health and

---

[9] In particular, we find remarkable our dissenting colleagues' proposed rule that even when substantial evidence indicates an HIV-positive individual has reason to know of his or her infection, this individual owes *no* duty of care as a matter of law to any sexual partner, and that such a duty could arise *only* when the individual acquires actual knowledge of the infection—although neither Justice Werdegar nor Justice Moreno ever defines how actual knowledge may be established, other than to reject the definition Justice Kennard proposes. Thus, under their proposed rule, an intravenous drug user who knowingly shares needles daily with a circle of HIV-positive individuals and has symptoms "associated with HIV" (dis. opn. of Moreno, J., *post*, at p. 1214, fn. 1) owes *no* duty of care as a matter of law when he or she insists on engaging in unprotected sex with or donates blood to uninfected individuals. Or, to put it another way, a defendant spouse who was in a relationship that "contemplated sexual exclusivity," who "represented himself as disease free and repeatedly insisted that the parties forgo the use of condoms," and who had reason to know he was infected with HIV has no duty even to warn the other spouse. (Dis. opn. of Werdegar, J., *post*, at pp. 1210–1211.) None of the statutes cited by our colleagues even arguably suggests the Legislature intended these results.

[10] The dissenting opinions rely also on a false dichotomy between tort recovery for those individuals who have been negligently infected with HIV and legislative efforts to build awareness of HIV through education and voluntary testing. Education and tort liability can—and invariably *do*—work hand in hand in preventing harmful behavior. (*Developments in the Law: Sexual Orientation and the Law* (1989) 102 Harv. L.Rev. 1508, 1530, fn. 77 ["Education and tort suits against persons transmitting AIDS through sexual conduct are other viable alternatives for deterring AIDS transmission"].) We likewise disagree with Justice Moreno that the best way to protect "the populations most vulnerable to infection" with HIV is to reduce the incentive of all infected persons to guard against transmission of the virus. (Dis. opn. of Moreno, J., *post*, at p. 1222.)

Safety Code section 120975, which protects the identity of a person taking an HIV test. As the Court of Appeal found, John waived (or is estopped from invoking) this statutory protection by claiming in his answer that Bridget infected him with HIV and by relying on a negative HIV test in support of his motion for summary judgment. (See Taub, *Doctors, AIDS, and Confidentiality in the 1990's* (1994) 27 J. Marshall L.Rev. 331, 335 ["courts have held that patients waived their confidentiality rights with respect to their HIV status by placing their medical condition at issue in litigation"].) Nor need we consider the extent of permissible discovery about the HIV status of third parties, since (as the dissenting opinions concede) the discovery we have authorized does not include identifying information about John's sexual partners. In response to the dissenting opinions' concerns about future discovery in this and other cases, we reiterate that we do not (and properly cannot) opine as to the propriety of discovery requests that are not before us.

Finally, Justice Moreno's fear of a spate of shakedown lawsuits designed to force lucrative settlements or to embarrass a former sexual partner is ill-founded and overblown. Such a risk applies equally to tort actions under an actual knowledge standard. Indeed, the risk inheres in a tort for the transmission of *any* venereal disease. The fact that no jurisdiction has yet been deluged with such suits persuasively rebuts this concern. Moreover, the use of protective orders, sealing orders, and the identification of parties by their initials as well as the constitutional and statutory limits on discovery will ensure that the burden on the litigants and third parties will be minimized to the extent possible and should assuage the fear that litigation will be used as a bludgeon or will become a media circus.

In sum, we are not persuaded that California should be the first jurisdiction in the country to limit liability for the negligent transmission of HIV only to those who have actual knowledge they are HIV positive.

### B. *Whether Discovery Must Be Limited Because of John's Right to Privacy Under the State Constitution*

█ Article I, section 1 of the California Constitution recognizes a number of inalienable rights, including the right to privacy. As we have previously observed, the right of privacy extends to sexual relations (*Vinson v. Superior Court, supra,* 43 Cal.3d at p. 841) and medical records (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 41 [26 Cal.Rptr.2d 834, 865 P.2d 633]). Accordingly, a litigant may invoke the constitutional right to privacy as justification for refusing to answer questions that unreasonably intrude on that right. (*Britt v. Superior Court* (1978) 20 Cal.3d 844, 855 [143 Cal.Rptr. 695, 574 P.2d 766] [associational privacy]; *Fults v. Superior Court* (1979) 88 Cal.App.3d 899, 903 [152 Cal.Rptr. 210] [sexual privacy].)

The right to privacy, however, is not absolute. In appropriate circumstances, this right must be balanced against other important interests. (*Hill v. National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th at p. 37.) "On occasion [a party's] privacy interests may have to give way to [the] opponent's right to a fair trial. Thus courts must balance the right of civil litigants to discover relevant facts against the privacy interests of persons subject to discovery." (*Vinson v. Superior Court*, *supra*, 43 Cal.3d at p. 842.)

Here, defendant has invoked his constitutional right to privacy as justification for refusing to answer questions concerning his HIV status or his sexual history. Bridget, in turn, has identified not only "the historically important state interest of facilitating the ascertainment of truth in connection with legal proceedings" (*In re Lifschutz* (1970) 2 Cal.3d 415, 432 [85 Cal.Rptr. 829, 467 P.2d 557]), but also the state's compelling interest in preventing the spread of AIDS, a communicable and dangerous disease. Penal Code section 12022.85, which provides for a three-year enhancement if the perpetrator of specified felonies knows he or she is HIV positive, and Health and Safety Code section 120291, which makes it a felony to intentionally infect another with HIV, are strong statements by the Legislature that the spread of HIV is a serious public health threat and that its control is of paramount importance. (See generally *Cruzan v. Director, Missouri Dept. of Health* (1990) 497 U.S. 261, 282 [111 L.Ed.2d 224, 110 S.Ct. 2841] [recognizing the state's "unqualified interest in the preservation of human life"].)

In balancing these competing concerns, we note at the outset that this is not a case in which a plaintiff seeks discovery to obtain information from a defendant whose HIV status is unknown. Both parties have admitted they are HIV positive, informally and in court filings. John thus has a diminished privacy interest in his HIV status. (Cf. *In re Marriage of Bonneau* (1998) 294 Ill.App.3d 720 [229 Ill.Dec. 187, 691 N.E.2d 123, 134] [declining to permit discovery of medical records where neither party's HIV status was alleged].) Moreover, not only does the complaint allege sufficient facts to permit the inference that John infected Bridget with HIV, but John has alleged that Bridget infected *him*. By thus putting his own medical condition at issue, John has "substantially lowered" his expectation of privacy even further. (*Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 43 [32 Cal.Rptr.2d 200, 876 P.2d 999].) After balancing the competing interests in this case, we are persuaded that Bridget is entitled to discovery concerning John's sexual history and HIV status.

We emphasize, though, that Bridget is not entitled to discovery without limit. As the Court of Appeal pointed out, even where the plaintiff can establish a compelling state interest in discovery, " ' " '[p]recision of [compelled disclosure]' " ' is required so that the right of privacy is not

' " 'curtailed except to the extent necessitated by the legitimate governmental objective.' " ' " Thus, where a plaintiff seeks discovery from a defendant concerning sexual matters protected by the constitutional right of privacy, the "intrusion upon sexual privacy may only be done on the basis of ' "practical necessity" ' (*Fults* v. *Superior Court, supra,* at pp. 904–905), and 'the compelled disclosure [must] be narrowly drawn to assure maximum protection of the constitutional interests at stake.' (*Britt* v. *Superior Court, supra,* [20 Cal.3d] at p. 859.)" (*Boler v. Superior Court* (1987) 201 Cal.App.3d 467, 473–474 [247 Cal.Rptr. 185].)

It is therefore essential to measure the closeness of the fit between the requested discovery and the allegations of the complaint. The theory of Bridget's complaint is that John became infected with HIV prior to or during their relationship by engaging in unprotected sex with other men, that he knew or had reason to know he was infected before he engaged in unprotected sex with her, that he did not share his knowledge with Bridget or otherwise take steps to prevent transmission of the virus, and that he infected her with HIV during unprotected sex. To prove these allegations, it is necessary for Bridget to inquire into John's medical records and his sexual activity, as the superior court and the Court of Appeal found.

Not all of the discovery authorized by the superior court and the Court of Appeal satisfies this heightened standard, however. To the extent that special interrogatory Nos. 3 and 13 and request for admission No. 10 seek information concerning John's sexual conduct *after* the couple stopped having sex—which, according to the complaint, was sometime during the honeymoon in July 2000—they are overbroad. John's sexual conduct after the cessation of marital sexual relations could not have resulted in the transmission of HIV to Bridget through sexual relations as alleged in the complaint, nor would it shed light on whether John knew or had reason to know that he was HIV positive at the time he and Bridget engaged in unprotected sex. Bridget thus has failed to identify the practical necessity for discovery of John's sexual conduct subsequent to their honeymoon.

The Court of Appeal also erred in upholding discovery into John's sexual behavior dating back years before he even met Bridget. Under the record as it currently stands, Bridget has failed to identify the practical necessity for discovery of John's sexual conduct any earlier than the six months that preceded his negative HIV test.

John's declaration in support of his motion for summary judgment states that he was tested for HIV in connection with a life insurance application on August 17, 2000, and includes a copy of the lab report. The results were negative. Based on information from the Centers for Disease Control that the

window period between exposure to HIV and the production of sufficient antibodies to detect the presence of the virus in the blood can last up to six months,[11] John reasons that he "was necessarily HIV negative six months prior to August 17, i.e., mid-February 2000, and at every prior time in his life." He therefore contends that any discovery related to his sexual history must be limited to the six-month window period. Bridget responds that John's negative HIV test in August 2000 is "a mere allegation which defendant has advanced as a part of his 'she-infected-me' defense and which plaintiff intends to prove to be patently *false*. Obviously, discovery cannot serve to debunk a lie if discovery is thwarted by having to assume the truth of the lie."

The defect in Bridget's response is that John's negative HIV test is not a mere allegation. John has supported his allegation with an applicant profile from Intellisys reflecting the results of his HIV test. If the test is accurate, and if the latency period for development of HIV antibodies is no longer than six months, John could not have been infected any earlier than February 2000. Under those circumstances, as Bridget's counsel conceded at oral argument, John's sexual behavior during that earlier period would not be relevant to the issue of when he became infected. In other words, Bridget has not demonstrated, under the heightened standard applicable to constitutional rights of privacy, a practical necessity for discovery of John's sexual conduct before he could have been infected with HIV.

On the other hand, as Bridget's counsel explained at oral argument, it is possible that Bridget could offer evidence to cast doubt on the results of the August 2000 HIV test, such as by challenging the accuracy or reliability of an insurance application test or by offering expert testimony that the test was inconsistent with John's development of full-blown AIDS the following year. If Bridget were to offer some basis to question the August 2000 test, or to adduce evidence that the time period from exposure to the virus to the development of antibodies in the blood can be longer than six months, then she may be entitled to discovery covering a broader time period. That option remains open to Bridget on remand. Because Bridget has not yet done so, however, we must balance John's constitutional right to privacy against Bridget's need for discovery based on the record as it currently stands. We must therefore limit her discovery requests concerning John's sexual behavior to the period between February 17, 2000, the earliest date at which John could have been infected, through July 2000, when the couple last had sexual relations.

---

[11] CDC, HIV/AIDS Prevention in the United States, FAQ: Symptoms; Testing; Treatment: How long after a possible exposure should I wait to get tested for HIV?, *supra*, at <http://www.cdc.gov/hiv/pubs/faq/faq9.htm> (as of July 3, 2006).

Finally, we emphasize that we have not been asked and therefore express no views as to what measures the trial court should employ to maintain the confidentiality of the materials produced in discovery. The propriety of in camera review, orders to seal documents, protective orders, and other measures is an issue that remains for the trial court on remand. (See *Schnabel v. Superior Court, supra*, 5 Cal.4th at p. 714.)

### C. Whether Discovery Must Be Limited Because of the Physician-Patient Privilege

John also asserts that the medical information sought by the subpoenas is protected by the physician-patient privilege but concedes, as he must, that "[t]here is no privilege under this article as to a communication relevant to an issue concerning the condition of the patient in a proceeding to recover damages on account of the conduct of the patient if good cause for disclosure of the communication is shown." (Evid. Code, § 999.) John contends that discovery must nonetheless be denied because a good cause showing should require at a minimum "an expert declaration regarding the [plaintiff's] infection status; the probable exposure period; and a description of the plaintiff's sexual history that establishes the defendant as a probable transmitter."

John cites no authority for his contention that a plaintiff must essentially eliminate other possible agents of infection before discovery may proceed. (Cf. *M.M.D. v. B.L.G., supra*, 467 N.W.2d at pp. 647–648 [evidence was sufficient to support liability despite inability of medical expert to determine whether plaintiff's herpes outbreak was due to a recent infection or a dormant virus].) The statutory standard is good cause, and Bridget has amply established good cause for disclosure of John's medical records concerning HIV and AIDS: she has recently been diagnosed as HIV positive; John, too, has been diagnosed as HIV positive, but his viral infection has already progressed to full-blown AIDS; during the two years preceding Bridget's diagnosis, she was dating John, engaged to him, and married to him; and the couple engaged in unprotected sex during that period. Bridget thus has offered far more than "conjecture" or a "speculative presumption" to justify the requested discovery. (*Mendez v. Superior Court* (1988) 206 Cal.App.3d 557, 570–571 [253 Cal.Rptr. 731].) Moreover, John has not offered any evidence to suggest that an expert could pinpoint the time period for Bridget's exposure to the virus. We therefore find that the superior court did not abuse its discretion in overruling John's objection under the physician-patient privilege.[12]

---

[12] We note also that John has already propounded discovery concerning Bridget's sexual history designed to uncover other possible agents of her infection. Those requests are not before us, and we express no views as to their propriety.

## IV. Disposition

The judgment of the Court of Appeal is reversed insofar as it affirmed the order compelling responses to plaintiff's special interrogatories and requests for admission to the extent they seek information about John's sexual history outside the time period between February 17, 2000, and the end of July 2000, and the matter is remanded for further proceedings consistent with the views herein.

George, C. J., Chin, J., and Corrigan, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—This case involves a discovery dispute that arose in the early stages of a lawsuit that a wife, Bridget B., brought against her husband, John B. In her complaint, Bridget alleged, among other things, that John negligently infected her with human immuno-deficiency virus (HIV) when they had unprotected sexual relations. To obtain the evidence necessary to prove her allegation, Bridget sought to discover various facts about John's sexual contacts with others, both before and during the marriage. John resisted the discovery, arguing that the information Bridget sought was irrelevant and that the proposed discovery violated his right of privacy under the California Constitution.

The majority concludes that the tort of negligent transmission of HIV will lie when "the actor knows or has reason to know he or she is HIV positive." (Maj. opn., *ante,* at p. 1191.) In their dissenting opinions Justices Werdegar and Moreno would limit liability to those who engage in sexual relations with actual knowledge of their HIV infection. (Dis. opn. of Werdegar, J., *post,* at p. 1210; dis. opn. of Moreno, J., *post,* at p. 1212.) Unlike the majority and the dissenters, I see no need to decide the level of knowledge necessary to trigger the tort duty.

I would simply apply normal discovery principles, under which Bridget is entitled to discover any unprivileged information that might reasonably assist her in evaluating her case, preparing it for trial, or facilitating a settlement. Applying that standard, the Court of Appeal properly permitted Bridget to discover information about John's sexual contacts (although not the identities of John's sexual partners) both before and during their marriage. Allowing this discovery does not violate John's constitutional privacy right, not only because he and Bridget are married, but also because John has put his own sexual conduct at issue by alleging that it was Bridget who infected him with HIV. Because Bridget would be entitled to discover this information under either the majority's "reason to know" standard of liability or Justice Moreno's "actual knowledge" standard, I take no position here on which of these two knowledge standards is appropriate for the tort of negligent

transmission of HIV. Under either standard the scope of discovery is the same, because evidence that John should have known that he was HIV positive is not only relevant to questions of negligence but also is circumstantial evidence that John actually knew he was HIV positive. Finally, I question the soundness of the majority's newly fashioned rule that all discovery implicating the constitutional right of sexual privacy must be supported by a showing of "practical necessity" for the information sought.

Insofar as the majority decision affirms the judgment of the Court of Appeal, I concur. I dissent, however, from the majority's imposition of temporal limits on the discovery of certain information that Bridget has sought.

## I.

Bridget and John began dating in 1998. John represented himself as a healthy, heterosexual man with old-fashioned values, and the couple became engaged on New Year's Eve 1999. In May 2000, the couple began living together until Bridget could find separate housing. That month or the next, Bridget received a telephone call, purportedly from the office of John's physician, saying that John had tested negative for HIV.

When the couple first became intimate they used condoms, but eventually John persuaded Bridget to switch to birth control pills. They were married in late July 2000, and ceased having sexual relations after their honeymoon. An HIV test of John done in connection with a life insurance application on August 17, 2000, was negative.

In September 2000, Bridget consulted John's physician about her exhaustion and high fevers. Testing revealed that she was HIV positive. When John also tested positive for HIV, the physician informed Bridget that she had brought "HIV into the marriage." John repeated that allegation a year later, shortly before he was diagnosed with acquired immune deficiency syndrome (AIDS). In November 2001, Bridget was told that the likelihood she had infected John was .03 percent. The next month, John for the first time revealed to Bridget that before their marriage he had had sexual relations with men; Bridget later learned that John continued to do so after their marriage.

In April 2002, Bridget sued John. Her complaint alleged facts she contends support causes of action for negligent as well as intentional infliction of emotional distress in that John knew or "had a reasonable belief" he had HIV before they engaged in unprotected sex, but nevertheless he insisted that she had infected him. She also alleged that John fraudulently misrepresented

himself as being free of communicable sexual diseases and that she engaged in unprotected sexual relations with him in reliance on that misrepresentation. Finally, she alleged that John's knowledge of his ongoing sexual conduct with male partners gave him a duty to warn her that unprotected sexual relations between them could expose her to sexually transmitted diseases.

Two months later, John answered the complaint; after generally denying its allegations, he specifically asserted that "[i]f either party transmitted the HIV virus to the other," it was Bridget who had infected him. He alleged as an affirmative defense that Bridget had assumed the risk of infection by engaging in unprotected sex with him before their marriage. Finally, he alleged that any claim against him for personal injury resulting from HIV infection was barred by the one-year statute of limitations. (Code Civ. Proc., former § 340, subd. (3) ["for injury . . . by the wrongful act or neglect of another . . . ."], amended by Stats. 1905, ch. 258, § 2, p. 232.)

At his deposition in January 2003, John refused to answer 124 questions about his sexual history and practices, maintaining that the information sought invaded his right to privacy under the California Constitution. In John's briefing to the trial court, he argued that disclosing his sexual history was not "directly relevant to the issue of his knowledge" of his HIV status, asserting that only his knowledge of his health status at the time he had unprotected sex with Bridget was directly relevant. John renewed his privacy objections when Bridget later propounded certain interrogatories and requests for admissions pertaining to his sexual history. The parties' discovery dispute was heard by a referee, who rejected John's claims that his constitutional right of privacy barred Bridget from discovering certain information about his sexual conduct, his sexual history, and his medical records relating to sexually transmitted diseases. The referee's report was confirmed by the trial judge, who ordered the requested discovery. John sought a writ of mandate in the Court of Appeal, arguing that the discovery ordered would infringe his statutory and constitutional rights to privacy.

The Court of Appeal struck all of the special interrogatories that sought the names, addresses, and telephone numbers of men with whom John had had sexual relations. Because Bridget did not seek review in this court of that part of the Court of Appeal's decision, the propriety of that stricken discovery is not before us. The discovery at issue here includes only those special interrogatories, requests for admission, and medical record subpoenas ordered by the trial court, but not those that pertain to identifying John's sexual partners and were stricken by the Court of Appeal. (Maj. opn., *ante,* at pp. 1184–1186.)

## II.

To determine the propriety of the discovery Bridget has sought, this court need not resolve whether, as the majority concludes, Bridget can recover in tort if John had reason to know that he was HIV positive, or only if he actually knew he was HIV positive when they had unprotected sexual relations. " 'Under the discovery statutes, information is discoverable if it is unprivileged and is either relevant to the subject matter of the action or reasonably calculated to reveal admissible evidence.' " (*Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 711 [21 Cal.Rptr.2d 200, 854 P.2d 1117]; see Code Civ. Proc., § 2017.010.) " '[I]n accordance with the liberal policies underlying the discovery procedures, doubts as to relevance should generally be resolved in favor of permitting discovery [citation].' " (*Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652, 656 [125 Cal.Rptr. 553, 542 P.2d 977].) Evidence is relevant for discovery purposes "if it might reasonably assist a party in evaluating its case, preparing for trial, or facilitating a settlement." (*Glenfed Development Corp. v. Superior Court* (1997) 53 Cal.App.4th 1113, 1117 [62 Cal.Rptr.2d 195].) Evidence that is relevant for purposes of discovery need not be admissible; it will be relevant, and hence discoverable, if it might reasonably lead to other, admissible evidence. (*TBG Ins. Services Corp. v. Superior Court* (2002) 96 Cal.App.4th 443, 449 [117 Cal.Rptr.2d 155].) Courts "shall limit the scope of discovery" when they determine that "the burden, expense, or intrusiveness of that discovery clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence," and they "may make this determination pursuant to a motion for protective order by a party or other affected person." (Code Civ. Proc., § 2017.020, subd. (a).)

To determine what discovery is relevant, courts look to the allegations of the complaint. Here, Bridget alleged causes of action for intentional as well as negligent infliction of emotional distress on the basis that John *knew* he was HIV positive before he engaged in unprotected sex with her. As to the cause of action for negligent infliction of emotional distress, Bridget further alleged John either "knew or had a reasonable belief that he had HIV." Those factual allegations as to John's degree of knowledge were incorporated by reference into Bridget's causes of action for fraudulent misrepresentation and for negligent failure to disclose his HIV status. For each of the causes of action Bridget seeks to allege, evidence tending to prove John's actual knowledge of his HIV-positive status is relevant. The definition of the elements of the tort of negligent transmission does not affect the scope of discovery, because any evidence tending to show that John *should have known* that he was HIV positive is also circumstantial evidence that he *actually knew* he was HIV positive. Because resolution of the discovery issue in this case does not turn on the elements of the tort of negligent transmission of HIV, a subject debated at length by both the majority and the dissent, I

would not reach the question of whether the tort requires actual knowledge or reason to know that one is HIV positive.

Under the ordinary test of relevance applicable to discovery, the majority improperly limits discovery in two ways. First, it bars discovery of John's sexual relations for the period more than six months before he tested HIV negative on August 17, 2000. (Maj. opn., *ante,* at pp. 1200–1202.) Even assuming that Bridget will be unable to attack the relevance of that timeframe or the accuracy of the August 2000 test, John's conduct during that earlier period might still reveal whether he regularly or habitually acted negligently with respect to the risks of contracting or transmitting HIV. Second, the majority bars Bridget from discovering information pertaining to John's sexual conduct after he and Bridget stopped having sexual relations. (Maj. opn., *ante,* at p. 1201.) But John's conduct during that period—in particular, whether he revealed his HIV-positive status to any sexual partners—could be highly relevant to Bridget's claim that John intentionally concealed his disease from her.

The right of privacy accorded by our state Constitution protects John's interest in making intimate personal decisions in the conduct of his sexual life, an interest we have described as autonomy privacy. (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35–36 [26 Cal.Rptr.2d 834, 865 P.2d 633]; see, e.g., *Vinson v. Superior Court* (1987) 43 Cal.3d 833, 841 [239 Cal.Rptr. 292, 740 P.2d 404] (*Vinson*).) The right of privacy in sexual conduct is held by the married and the unmarried alike. (*Vinson,* at p. 841.)

Here, the majority's limitations on discovery are not necessary to protect John's right to sexual privacy under article I, section 1 of the California Constitution. When a party asserts an invasion of a constitutionally protected privacy interest, courts apply a balancing test. (*Hill v. National Collegiate Athletic Assn., supra,* 7 Cal.4th at p. 37.) Because "[t]he diverse and somewhat amorphous character of the privacy right necessarily requires that privacy interests be specifically identified and carefully compared with competing or countervailing privacy and nonprivacy interests" (*ibid.*), the inquiry is made on a case-by-case basis (see *Vinson, supra,* 43 Cal.3d at pp. 841–842 [using a case-specific analysis]).

Here John, as husband, is in the anomalous position of arguing that his personal right to sexual privacy protects him from providing otherwise relevant discovery to his wife, Bridget. By alleging that John infected her with HIV, Bridget may be deemed to have implicitly waived her constitutional privacy right against discovery that is "directly relevant" and "essential to a fair resolution" of that claim. (*Vinson, supra,* 43 Cal.3d at p. 842 [discussing *Britt v. Superior Court* (1978) 20 Cal.3d 844, 859 [143 Cal.Rptr.

695, 574 P.2d 766]].) John has made a similar claim in his answer to the complaint, asserting that Bridget infected him with HIV. In this factual context, I conclude that, as between themselves, John and Bridget, who at all relevant times were either planning to be married or were married, both have a vastly diminished constitutional right of personal privacy with regard to disclosure to one another of their sexual conduct with others.

The majority limits Bridget's discovery requests, asserting that privacy protections for sexual behavior require her to establish the "practical neces- sity" for the information she seeks to discover from John. (Maj. opn., *ante,* at p. 1200.) Almost 40 years ago, this court applied a practical necessity standard in a decision precluding a county government from conditioning public employment or other benefits on a loyalty oath that imposed substan- tial burdens on the First Amendment rights of speech and association granted by our federal Constitution. (*Vogel v. County of Los Angeles* (1967) 68 Cal.2d 18, 21 [64 Cal.Rptr. 409, 434 P.2d 961]; see also *Bagley v. Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 505 [55 Cal.Rptr. 401, 421 P.2d 409] [practical necessity showing must be made by employer seeking to limit political activity by public employee].) *Vogel* described the government's "heavy burden of demonstrating the practical necessity for the limitation" that a loyalty oath imposed on the rights of the affected citizens. (*Vogel,* at p. 21.) Thereafter two Court of Appeal decisions—*Fults v. Superior Court* (1979) 88 Cal.App.3d 899 [152 Cal.Rptr. 210] (*Fults*) and *Boler v. Superior Court* (1987) 201 Cal.App.3d 467 [247 Cal.Rptr. 185] (*Boler*)—applied the practical necessity test to civil discovery that allegedly intruded on sexual privacy.

*Fults* was a paternity action brought by the County of Sonoma, which sought to recoup from the child's father public assistance provided for the child's support. (*Fults, supra,* 88 Cal.App.3d at p. 901 & fn. 1.) When the defendant father sought to discover the names and addresses of all men with whom the mother had ever had sexual intercourse, the mother refused to provide that information except as temporally relevant to the date of the child's conception. (*Id.* at pp. 902, 904.) After citing the practical necessity phraseology this court used in *Vogel,* the Court of Appeal in *Fults* rejected a discovery order spanning a two-year period centered on the likely date of conception. (*Id.* at p. 905.) It concluded that the defendant had made no showing that the discovery sought was "likely to turn up material informa- tion," and therefore its utility did not outweigh the mother's right to sexual privacy. (*Ibid.*)

The second Court of Appeal decision, *Boler,* involved discovery sought in a workplace sexual harassment suit. (*Boler, supra,* 201 Cal.App.3d at p. 469.) The plaintiff employee sought to discover the identities of all women that her employer had both "worked with and slept with." (*Id.* at p. 474.) Because the

relevant information (complaints by coworkers who found the employer's attentions unwelcome) could be obtained by less intrusive means, the Court of Appeal concluded that the discovery sought was not justified by practical necessity, noting that the broad discovery impermissibly invaded the privacy rights of women whose sexual relationships with the employer were consensual. (*Id.* at pp. 473–474.)

Some three months before the Court of Appeal decided *Boler, supra,* 201 Cal.App.3d 467, this court in *Vinson, supra,* 43 Cal.3d 833, which involved a claim of sexual harassment, addressed discovery that implicated the constitutional right of sexual privacy. Notably absent from our analysis in *Vinson* is any mention of the practical necessity test. Instead, this court concluded that the plaintiff had waived her right to sexual privacy as to discovery that was "directly relevant" to her claim and "essential to its fair resolution." (*Id.* at p. 842.) Referring to plaintiff's unwaived sexual privacy rights, the opinion emphasized that courts "must balance the right of civil litigants to discover relevant facts against the privacy interests of persons subject to discovery." (*Id.* at p. 842.) And this court pointed out that the sexual privacy rights of plaintiffs who bring civil actions for sexual harassment, sexual assault, or sexual battery are protected by a statutory requirement that discovery of their sexual history may be had only on a showing of good cause. (Code Civ. Proc., § 2017.220; *Vinson,* at pp. 843–844 [discussing predecessors to § 2017.220].) In light of this court's decision in *Vinson,* I question the majority's assertion here that intrusions on the constitutional right of sexual privacy may only be countenanced on a showing of practical necessity. (Maj. opn., *ante,* at p. 1200.)

Such a showing is unnecessary here. Both Bridget and John have already put their own sexual conduct at issue, and they have implicitly waived some of their rights to sexual privacy. (*Vinson, supra,* 43 Cal.3d at p. 842.) And their remaining sexual privacy rights are "not necessarily absolute." (*Ibid.*) Because each alleges that the other, rather than some third party, is the source of the infection, both must accept inquiry into their sexual conduct with partners other than their spouse as a possible source of the infection. Accordingly, unlike the majority (maj. opn., *ante,* at p. 1200) and Justice Werdegar (dis. opn. of Werdegar, J., *post,* at p. 1211), I would not require Bridget to show a practical necessity for discovery of John's sexual conduct after July 2000, when the couple ceased to have sexual relations with one another. Even under a practical necessity test, the information Bridget seeks to discover from John is of a type that she has no ready means of obtaining, except from John. (See, e.g., *Boler, supra,* 201 Cal.App.3d at p. 474 [plaintiff had alternative means of obtaining discovery].)

Notwithstanding the diminished right to privacy of John and Bridget as between one another, they each retain some sexual privacy interests. I would

leave the protection of those privacy interests to the discretion of the trial court, which remains free to fashion protective orders or to adopt other measures tailored to the specific information and documents before it. Moreover, I stress that my conclusion that John and Bridget have a diminished privacy interest *as to one another* in the context of this litigation does not affect the privacy interests of other persons. Bridget's discovery of the identities of John's previous sexual partners was precluded by the Court of Appeal and is not an issue before us.

### III.

For the reasons given above, I would affirm the judgment of the Court of Appeal.

**WERDEGAR, J.,** Dissenting.—I respectfully dissent. Notwithstanding my sympathy with the law's preference for prudence in sexual matters, as in general (Civ. Code, § 1714), I am unwilling in the context of this atypical case to join the majority in creating the prospect that an individual may be drawn into intrusive litigation, whether as a party, witness, or respondent to discovery requests, whenever a former partner, or that partner's subsequent partner, contracts a sexually transmitted disease.

I do not question that one who negligently transmits human immunodeficiency virus (HIV) to another may be held liable in tort. On this point, I agree with all of my colleagues. I part company with the majority, however, in its creating the prospect of tort liability for future defendants who are alleged not actually to have known, but merely to have possessed "constructive knowledge," they were infected. The majority's vague and inconclusive treatment of the concept of constructive knowledge in my view demonstrates that its enterprise in this respect is not only premature—given this is a case in which actual knowledge is alleged (see maj. opn., *ante*, at p. 1183)—but also insufficiently grounded in California law and ill considered as a matter of public policy.

As Justice Moreno's dissenting opinion ably demonstrates, a Californian's medical privacy is protected by a complex of statutes, case law, and ethical principles. Our Legislature has given particular and heightened protection to the confidentiality of an individual's HIV status. (See dis. opn. of Moreno, J., *post*, at pp. 1216–1219.) In this case, however, most of these protections are not in issue because the parties already have disclosed that they are HIV positive and each is accusing the other of transmitting the virus. Moreover, as the majority emphasizes, the alleged relationship between the parties was not limited to sexual encounters but, rather, was a marriage of spouses who contemplated sexual exclusivity. (Maj. opn., *ante*, at pp. 1183, 1187, 1193.)

John B. allegedly not only knew he was HIV positive (*id.* at p. 1183), but represented himself as disease free and repeatedly insisted that the parties forgo the use of condoms (*id.* at pp. 1187, 1193). Bridget B. allegedly would not have engaged in unprotected sex had she known John had been sexually active with other people prior to and during their marriage. (*Id.* at p. 1183.) I agree with the majority that in these circumstances and on such egregious facts Bridget potentially may state a cause of action against John for negligently transmitting HIV to her. Upon demonstrating "practical necessity," moreover, she may obtain narrowly drawn discovery circumscribed by appropriate confidentiality measures. (See *id.* at pp. 1200–1202.)

I disagree, however, that Bridget may prevail on any such cause of action merely by showing that John had constructive knowledge he was HIV positive.[1] As Justice Moreno correctly observes, no California statute or judicial decision establishes that mere constructive knowledge may support liability for negligent HIV transmission. (See dis. opn. of Moreno, J., *post*, at p. 1214.) Moreover, as counsel pointed out at oral argument, the record contains neither factual findings nor briefing upon the complex issues of AIDS policy this case implicates. Perhaps partly for this reason, the majority does not persuasively address these issues; I share in particular Justice Moreno's concern that the majority fails to adequately consider the Legislature's response to them. As he points out, the majority, for example, does not attempt to reconcile the discovery its opinion authorizes with Health and Safety Code section 120975, except to state John himself has waived that statute's protection by placing his HIV status in issue. (See dis. opn. of Moreno, J., *post*, at p. 1218, citing maj. opn., *ante*, at p. 1198.)[2]

I disagree, moreover, with the majority's assertion that allowing Bridget to discover John's sexual history during the six-month period preceding his negative HIV test may yield evidence relevant to show John knew or "had

---

[1] For clarity, I emphasize that, contrary to the majority's assertion, I have not proposed any categorical rule that a defendant spouse who behaves as defendant here is alleged to have behaved and who has "reason to know" he is infected with HIV "has no duty even to warn the other spouse." (Maj. opn., *ante*, at p. 1197, fn. 9, citing this dissent.) Rather, I agree such a person *may* have a duty to warn a spouse if, in fact, he knows he is infected. But I remain unwilling on the present record, which does not permit full consideration of the public policy ramifications, to impose new warning duties on persons who do *not* know they are infected.

[2] Health and Safety Code section 120975 provides in its entirety: "To protect the privacy of individuals who are the subject of blood testing for antibodies to human immunodeficiency virus (HIV), the following shall apply: [¶] Except as provided in Section 1603.1 [disclosure to blood banks by health officials], 1603.3 [notification of blood donors], or 121022 [assuring access to anonymous testing while directing health care providers to report HIV cases consistently with federal funding requirements], no person shall be compelled in any state, county, city, or other local civil, criminal, administrative, legislative, or other proceedings to identify or provide identifying characteristics that would identify any individual who is the subject of a blood test to detect antibodies to HIV."

reason to know" he was infected. (See maj. opn., *ante*, at p. 1193.) As Bridget's counsel acknowledged in oral argument, discovery that John had unprotected sex with other people during that time would reveal nothing pertinent; only if Bridget could discover the names and HIV status of John's former sexual partners—information protected by statute—would she learn anything arguably relevant to her causes of action, even assuming application of a "reason to know" standard. Accordingly, I agree with Justice Moreno that Bridget is entitled only to discovery directed at whether and when John had actual knowledge he was HIV positive and not to discovery of John's sexual history.

The majority as well as Justice Moreno in dissent cite numerous policy considerations they believe support their different conclusions. This divergence of views—all conjecture as far as this court knows—illustrates that complex public health, privacy, and other policy issues are involved in determining the scope of a tort for negligent transmission of HIV or acquired immune deficiency syndrome (AIDS). Given the complexity of such issues, this court is ill equipped and ill advised to venture into an area the Legislature already has extensively addressed.

**MORENO, J.,** Dissenting.—In this case of first impression, the majority holds that a wife who sues her husband claiming that he negligently infected her with the human immunodeficiency virus (HIV) is not limited to a theory that he did so knowing he was HIV positive but that liability also extends "to those situations where the actor, under the totality of circumstances, has *reason to know* of the infection." (Maj. opn., *ante*, at p. 1191.) According to the majority, reason to know exists "when there is sufficient information to cause a reasonably intelligent actor to infer he or she is infected with the virus or that infection is so highly probable that his or her conduct would be predicated on that assumption." (*Id.* at p. 1192.) Based on these conclusions, the majority authorizes broad discovery into defendant's sexual history.

I dissent. While I agree that a defendant who *knows* that he or she is *infected with HIV and conceals that fact* from a partner with whom the defendant has unprotected sex may be held liable for negligently transmitting the virus, I do not agree, for the reasons set forth below, that such liability may be predicated on a later finding by a trier of fact that the defendant *had reason to know* that he or she was infected with HIV. In this case, therefore, I would hold that plaintiff is entitled to discovery directed at whether and when defendant had actual knowledge he was HIV positive, but not to discovery of defendant's sexual history.

Whether particular information is discoverable necessarily depends on whether there is a cause of action as to which that discovery is either relevant

or " 'reasonably calculated to reveal admissible evidence.' " (*Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 711 [21 Cal.Rptr.2d 200, 854 P.2d 1117].) The majority acknowledges that "[t]his court has not yet had occasion to consider the tort of negligent transmission of a sexually transmitted disease" but concludes "the tort is far from novel," citing two California Court of Appeal decisions and a number of decisions from our sister jurisdictions. (Maj. opn., *ante*, at p. 1188.) The majority thus implies that the creation of a cause of action for negligent transmission of HIV based on a constructive knowledge standard is simply a logical extension of existing precedent. Not so.

Neither of the Court of Appeal decisions cited by the majority supports its expansion of the law. In *Kathleen K. v. Robert B.* (1984) 150 Cal.App.3d 992 [198 Cal.Rptr. 273], the plaintiff alleged she had contracted genital herpes from the defendant. Judgment was rendered in the defendant's favor. On review, the Court of Appeal noted that the plaintiff's negligence claim included a constructive knowledge allegation that, because the appeal was from a judgment on the pleadings, the court "accepted as true." (*Id.* at p. 994.) The court rejected claims by the defendant that the plaintiff's complaint was barred by either the right of privacy or the anti-heart-balm statute (Civ. Code, § 43.5, subd. (c)), and reversed the judgment. (*Kathleen K., supra,* 150 Cal.App.3d at pp. 996–998.) Because the court had no occasion to decide whether negligent transmission of a sexually transmitted disease must be based on an actual knowledge standard only or if it can also be based on constructive knowledge, *Kathleen K.* is not authority for the proposition that a constructive knowledge standard will suffice. (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 343 [14 Cal.Rptr.3d 857, 92 P.3d 350] ["A decision, of course, does not stand for a proposition not considered by the court"].)

*Doe v. Roe* (1990) 218 Cal.App.3d 1538 [267 Cal.Rptr. 564] lends even less support for the majority's conclusion because in that case, which also involved transmission of herpes, it was undisputed that the defendant had actual knowledge he was infected was herpes, and had had several prior outbreaks, but "believed that he could not transmit it to [the plaintiff] as long as he was symptom-free." (*Id.* at p. 1541.) In affirming judgment for the plaintiff, the court emphasized that the "defendant admittedly had *actual knowledge* that herpes was sexually transmissible . . . . Having discovered that he had a venereal disease, defendant did nothing." (*Id.* at p. 1546.)

In the absence of support in California law for its conclusion that a constructive knowledge standard will support the negligent transmission of HIV, the majority relies on a spate of decisions from other jurisdictions. (*Meany v. Meany* (La. 1994) 639 So.2d 229 [herpes]; *Berner v. Caldwell* (Ala. 1989) 543 So.2d 686 [same]; *Hamblen v. Davidson* (Tenn.Ct.App. 2000)

50 S.W.3d 433 [same]; *Deuschle v. Jobe* (Mo.Ct.App. 2000) 30 S.W.3d 215 [same]; *M.M.D. v. B.L.G* (Minn.Ct.App. 1991) 467 N.W.2d 645 [same]; *McPherson v. McPherson* (1998) 1998 ME 141 [712 A.2d 1043] [human papilloma virus (HPV)]; *Mussivand v. David* (1989) 45 Ohio St.3d 314 [544 N.E.2d 265] [transmission of unspecified sexual disease].) While these decisions do recognize a claim for negligent transmission of a sexually transmitted disease based on actual or constructive knowledge, only one of them, *Doe v. Johnson* (W.D.Mich. 1993) 817 F.Supp. 1382, involves the transmission of HIV; the others, as noted above, involve herpes, HPV, or an unspecified disease.[1]

As I shall explain, the distinction between HIV and other sexually transmitted diseases is crucial when discussing the wisdom of creating a cause of action for negligent transmission based on constructive knowledge. Contrary to the majority's analysis, creation of such a tort for HIV is not a simple extension of existing California law, nor has any other state created such a cause of action.[2] It must be clearly understood, therefore, that in creating this cause of action the majority ventures into largely uncharted waters.

This expansion of the law cannot be justified by the majority's application of the *Rowland* factors (*Rowland v. Christian* (1969) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561]) because its analysis proceeds from an a priori assumption that constructive knowledge *is* a viable theory upon which to base a claim for negligent transmission of HIV. Rather, in deciding whether to create this cause of action, the analysis must begin with the relevant policy considerations. (*Borer v. American Airlines, Inc.* (1977) 19 Cal.3d 441, 446–447 [138 Cal.Rptr. 302, 563 P.2d 858] [" 'In delineating the extent of a tortfeasor's responsibility for damages under the general rule of tort liability (Civ. Code, § 1714), the courts must locate the line between liability and nonliability at some point, a decision which is essentially political' "];

---

[1] In *Doe v. Johnson*, plaintiff Jane Doe alleged that defendant Earvin "Magic" Johnson wrongfully transmitted HIV to her through consensual sexual conduct. Included in her action were allegations that Johnson knew or should have known he was infected with HIV. The district court found that constructive knowledge could be based on the presence of symptoms associated with HIV or actual knowledge that a prior partner was HIV positive. (*Doe v. Johnson, supra*, 817 F.Supp. at p. 1392.) Although I do not agree with *Doe* that a constructive knowledge standard is appropriate in a claim involving the negligent transmission of HIV, *Doe* at least applies a more rigorous standard of what constitutes constructive knowledge than the majority.

[2] In *Plaza v. Estate of Wisser* (1995) 211 A.D.2d 111 [626 N.Y.S.2d 446], the appellate court, without substantive analysis, held that allegations in a complaint that the defendant knew or had reason to know he was infected with HIV prior to his having been diagnosed as HIV positive, including an allegation that he was aware a prior sexual partner was HIV positive, were sufficient to withstand a motion to dismiss fraud and negligence claims. (*Id.* at pp. 450–451.) These allegations were made in a procedural context that required the reviewing court to accept them as true. (*Id.* at p. 452.)

*Dillon v. Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912] [" ' "duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection' "].)

Accordingly, the question before this court is whether creation of a cause of action for negligent transmission of HIV—and not some other sexually transmitted disease—based on a constructive knowledge standard will serve the relevant policy considerations associated with the fight against the AIDS epidemic. I believe the answer is no.

To begin with, the majority fails even to recognize the relevant policy considerations associated with the AIDS epidemic because the majority assumes that AIDS is the same as other sexually transmitted diseases and the same analytic framework can be applied to the negligent transmission of HIV as is applied to other sexually transmitted diseases (see maj. opn., *ante*, at p. 1193). This is inaccurate. Unlike other sexually transmitted diseases HIV infection has been, and continues to be, life-threatening "killing over half a million Americans as of the end of 2003." (Maj. opn., *ante*, at p. 1195.) There are also significant medical differences between these other sexually transmitted diseases and HIV infection. HIV infection can remain latent for years before the appearance of any kind of symptom, unlike other sexually transmitted diseases and, unlike symptoms associated with other sexually transmitted diseases, the symptoms of AIDS-related disease, because they are generally nonspecific to AIDS, may not necessarily alert a person to the fact that he or she is HIV positive. (U.S. Dept. of Health & Human Services, Centers for Disease Control and Prevention (CDC), HIV/AIDS Prevention in the United States FAQ: How can I tell if I'm infected with HIV?, at <http://www.cdc.gov/hiv/pubs/faq/faq5.htm> [as of July 3, 2006] ["The only way to know if you are infected is to be tested for HIV infection. You cannot rely on symptoms to know whether or not you are infected. Many people who are infected with HIV do not have any symptoms at all for many years. . . . [¶] . . . [¶] The symptoms of AIDS are similar to the symptoms of many other illnesses"] (boldface omitted).) Finally, AIDS is unique in the opprobrium with which those infected with HIV are viewed in part because one of the populations most at risk has been traditionally stigmatized on the basis of sexual orientation. (*Urbaniak v. Newton* (1991) 226 Cal.App.3d 1128, 1140 [277 Cal.Rptr. 354] [HIV-positive status "is ordinarily associated either with sexual preference or intravenous drug uses. It ought not to be, but quite commonly is, viewed with mistrust or opprobrium"]; *Herbert v. Regents of University of California* (1994) 26 Cal.App.4th 782, 788 [31 Cal.Rptr.2d 709] [" 'Public speculation about the potential for transmission of [the AIDS] virus, the degree of morbidity, and other factors, has led to expression of public fears or anxieties approaching, in some circumstances, panic or hysteria' "]; see CDC, HIV/AIDS Prevention in the United

States, Basic Prevention, Fact Sheet, A Glance at the HIV/AIDS Epidemic <http://www.cdc.gov/hiv/resources/factsheets/At-A-Glance.htm> [as of July 3, 2006] ["In 2004, the largest estimated proportion of HIV/AIDS diagnoses were for men who have sex with men (MSM), followed by adults and adolescents infected through heterosexual contact"].)

The convergence of these three factors: the potential deadliness of HIV infection, the possibility that a person may be unknowingly infected with HIV for years, and the opprobrium to which those who are infected have been subjected, distinguishes HIV/AIDS from all other sexually transmitted diseases. Thus the battle to contain the transmission of HIV raises complex questions of public and public health policy not present with respect to other sexually transmitted diseases. Some of these questions are: What is the best way to promote testing for HIV given that testing is the only way to definitively determine HIV status? How can transmission of the virus be contained in light of the long period of latency and the absence of specific recognizable symptoms? How should prevention measures be balanced against the right of privacy in sexual matters? How can a policy promoting testing and preventing transmission be crafted so as to prevent discrimination against those infected with HIV and stigmatization of populations vulnerable to infection?

These are the questions this court should be considering before rushing into the complex terrain that constitutes AIDS policy. The majority has failed to adequately and persuasively address these difficult issues. Equally glaring is the majority's failure to adequately consider the Legislature's response to these questions because, for the last two decades, the Legislature has been the body responsible for setting AIDS policy in California through its enactment of a comprehensive system of AIDS-related statutes. (See Cal. Dept. of Health Services, Off. of AIDS, A Brief Guide to Cal.'s HIV/AIDS Laws, 2004 (Feb. 2005).)[3]

---

[3] The majority insists that HIV is no different from other sexually transmitted diseases like syphilis and HPV because they "are also life-threatening," and a social stigma may also attach to them. (Maj. opn., *ante,* at p. 1196.) The majority asserts that the dissent "fail[s] at bottom to explain why the distinctions between HIV and other sexually transmitted diseases . . . warrant wholesale rejection of ordinary tort principles in this case." (Maj. opn., *ante,* at p. 1196.) My point, of course, is not that tort principles are inapplicable to transmission of HIV but that the applicability of such principles *must* be examined in light of the special policy issues raised by HIV and the Legislature's response to those issues to ensure that the courts and the Legislature are on the same page with respect to combating this still potentially lethal disease. Since the majority denies that HIV is any different than other sexually transmitted diseases, it fails to undertake this examination. The majority's comparison of HIV to other sexually transmitted diseases is also specious. While other sexually transmitted diseases may have serious consequences, if untreated, and some degree of social stigma may attach to them, there is simply no comparison between those diseases and HIV in terms of the life-threatening potential of HIV and the stigma that attaches to it because of its association with drug use and homosexuality.

The Legislature's response to those policy questions I posed earlier has been to enact laws that encourage voluntary testing and voluntary disclosure of HIV status, promote initiatives to educate sexually active Californians about how to protect themselves against HIV infection, and guard against any tendency to conflate transmission of the virus with sexual orientation. Crucial to these policy goals is the requirement that HIV testing and test results be absolutely confidential. The guarantee of confidentiality is so important to the Legislature's efforts that unauthorized disclosure of another person's HIV test results may be punishable by fines and even imprisonment. (Health & Saf. Code, § 120980.)[4]

The Legislature's concern for confidentiality specifically extends to prohibiting unauthorized disclosure of an individual's HIV test results in civil discovery proceedings. Health and Safety Code section 120975 provides that to "protect the privacy of individuals who are the subject of blood testing for antibodies to human immunodeficiency virus . . . : [¶] . . . no person shall be compelled in any state, county, city, or other local *civil*, criminal, administrative, legislative, or other proceedings to identify or provide identifying characteristics that would identify any individual who is the subject" of an HIV test. (Health & Saf. Code, § 120975, italics added.)

*Irwin Memorial Blood Centers v. Superior Court* (1991) 229 Cal.App.3d 151 [279 Cal.Rptr. 911] examined this prohibition in the context of civil discovery and concluded that the prohibition is absolute. In *Irwin*, the plaintiffs brought an action against a blood bank, alleging that they had acquired AIDS from infected blood. They sought to take the depositions of blood donors implicated as potential sources of their infection. Applying the predecessor statute to Health and Safety Code section 120975, the Court of Appeal quashed an order granting the request even though the depositions were to be taken "behind a screen." (*Irwin*, at p. 157.) "[T]he production of the donor for deposition is in itself an identification within the meaning of the

(See, e.g., Fullbright, *Disease Denial Devastating for African Americans*, S.F. Chronicle (June 5, 2005) pp. 1, 8 ["The decades-long lag in identifying AIDS as a black health issue results from both the disease's initial identification as a white epidemic and its association with homosexuality, which carries a heavy stigma in the black community"].) The singularity of HIV is also evident in the Legislature's response to the AIDS epidemic in comparison to its treatment of other sexually transmitted diseases. For example, while the Legislature created an Office of AIDS within the California Department of Health (Health & Saf. Code, § 100117) it has not created a comparable office for any of the sexually transmitted diseases mentioned by the majority nor has it enacted anything like the large body of AIDS-specific statutes with regard to these other sexually transmitted diseases. Given all this, it is simply not plausible to assert that AIDS is no different from other sexually transmitted diseases.

[4] The recent enactment of legislation that requires California to use a name-based system for reporting cases of HIV/AIDS to public health agencies in order to protect federal funding does not impact statutes that bar the unauthorized disclosure of an individual's HIV status. (Keller, *Schwarzenegger Signs Bill to Track HIV Cases by Name*, L.A. Times (Apr. 18, 2006) p. B3.)

statute. . . . Until the time that the donor appears for deposition, the donor is a number unconnected to a person. Once the person is required to step forth, the connection between the number and the person is made. The donor has been identified. The *extent* to which that identification is made known to third parties will depend upon the care taken at the deposition but the identification in a civil proceeding has been made. This the statute prohibits." (*Ibid.*)

The majority does not attempt to reconcile the discovery that it authorizes with Health and Safety Code section 120975 except to assert that defendant has waived its protection by placing his HIV status at issue. (Maj. opn., *ante*, at p. 1198.) Even if this is true of defendant's own HIV status, it is not true of the identity or HIV status of any third party with whom he may have had a sexual relationship. While the discovery authorized by the majority regarding defendant's sexual history does not include identifying information for his prior sexual partners or their HIV status, but only the dates and number of his sexual encounters with other men, nothing in the majority opinion prevents plaintiff from renewing her request for such identifying information. To the contrary, the majority opinion *encourages* her to seek this information because it deems the discovery of defendant's sexual history relevant to whether defendant had reason to know he was infected with HIV. Moreover, at argument, plaintiff's counsel *acknowledged* that he would learn nothing useful if all that is disclosed to plaintiff is the limited information of the dates and number of defendant's past sexual encounters with other men. Now that plaintiff has the benefit of the majority opinion, she will inevitably renew her request for the identity of defendant's sexual partners to ascertain their HIV status and the particulars of their encounters with defendant.[5]

Thus, by creating this new tort, the majority puts this court into the position of encouraging plaintiff to seek disclosure that is not only statutorily prohibited (Health & Saf. Code, § 120975; *Irwin Memorial Blood Centers v. Superior Court, supra,* 229 Cal.App.3d at p. 157), and subject to civil and

---

[5] The majority's response that it need not consider the propriety of discovery requests not before it is part and parcel of its failure to examine the ramifications of its decision on legislatively enacted HIV policy, specifically, in this case, the effect of its newly minted tort on the proscription against the discovery of HIV test results in Health and Safety Code section 120975. This failure is particularly conspicuous in this case where, in argument, plaintiff's counsel essentially informed this court that he will be seeking identifying information about defendant's sexual partners. The majority also asserts that my interpretation of the HIV confidentiality statutes would "eliminate entirely the possibility of tort liability for the knowing *or* negligent transmission of HIV." (Maj. opn., *ante*, at p. 1197.) Certainly, one reading of these statutes may be that they would bar a claim for transmission of HIV insofar as that claim required a defendant to disclose his or her HIV status or the status of his or her sexual partners. This is precisely the kind of question with which the majority might have been expected to grapple before rushing to create a novel cause of action for transmission of HIV based on a constructive knowledge standard.

criminal penalties (Health & Saf. Code, § 120980) but quite likely unconstitutional as well. (*Vinson v. Superior Court* (1987) 43 Cal.3d 833, 841 [239 Cal.Rptr. 292, 740 P.2d 404] ["California's privacy protection . . . embraces sexual relations"].) Moreover, once people realize that their HIV status may be exposed during the course of discovery in cases like this, the incentive for voluntary testing provided by the Legislature's extensive guarantees of confidentiality will be eroded.

The majority seeks to justify imposition of a constructive knowledge standard by asserting that "limiting tort defendants to those who have actual knowledge they are infected with HIV would have perverse effects on the spread of the virus" because it would provide an incentive for some individuals to avoid diagnosis and treatment in order to avoid knowing they are infected. (Maj. opn., *ante*, at p. 1190.) I find it difficult to believe that avoidance of theoretical future civil liability would play any part in the decision of most people whether or not to get tested to determine if they are infected with a potentially life-threatening virus. I would also point out that this is the first case to reach our appellate courts in which a defendant is alleged to have negligently transmitted HIV. I submit, therefore, that the negligent transmission of HIV by irresponsible individuals is not such a widespread phenomenon that it requires us to create a new tort based on a knowledge standard the scientific viability of which has not been demonstrated and which raises serious issues about statutorily protected confidentiality guarantees and the state constitutional guarantee of privacy. Finally, to the extent that future civil liability is a concern, the majority opinion may have its own "perverse effects on the spread of the virus" by deterring voluntary disclosure of HIV infection to avoid such liability. If a person learns through testing that he or she is HIV positive, he or she would have no incentive to disclose the results of his or her status to his or her former sexual partners so that they might be tested, because under the majority's holding, to do so would invite them to sue him or her on the theory that he or she should have known he or she was infected even before he or she obtained the test results.

The majority finds "remarkable" what the majority characterizes as "our dissenting colleagues' proposed rule that even when substantial evidence indicates an HIV-positive individual has reason to know of his or her infection, that individual owes *no* duty of care as a matter of law to any sexual partner, and that such a duty could arise *only* when the individual acquires actual knowledge of the infection—although neither [dissent] ever defines how actual knowledge may be established . . . ." (Maj. opn., *ante*, at p. 1197, fn. 9.) The majority then, after repeatedly stating that it need not decide what facts would satisfy its reason to know standard, posits a hypothetical example that apparently would fulfill that standard, to wit, "an

intravenous drug user who knowingly shares needles daily with a circle of HIV-positive individuals and has symptoms 'associated with HIV.' " (*Ibid.*)

My conclusion that constructive knowledge should not be the standard for negligent transmission of HIV is guided by my assessment of the policy issues raised by the AIDS epidemic and the legislative response to those issues. It is the majority's disregard for these policy considerations and the Legislature's policy judgments in its rush to create this new tort, and not my analysis, that is "remarkable." In my view, the majority's ill-considered decision "intrudes into the Legislature's domain and indulges its own notions about what constitutes good public policy." (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1209 [39 Cal.Rptr.3d 821, 129 P.3d 29] (dis. opn. of Baxter, J.).) As for how actual knowledge may be established, as I have noted, according to the CDC, at this point in time, the only way an individual can definitively know whether he or she is infected is through testing. Whether there are or may be other diagnostic tools by which to determine a person's HIV status is not before us, in part because the majority's decision, unlike the Legislature's policy judgments, is not based on any of the underlying science that bears upon HIV infection or transmission.

As to the majority's hypothetical example—which indulges the rhetorical trick of setting forth an extreme scenario to justify a dubious conclusion—I would observe, first, that the example is incomplete because the majority neither explains how the hypothetical drug user would know that his fellow users are HIV positive nor describes his symptoms and their specific association with HIV as opposed to other illness. Moreover, after 25 years of widely available public information regarding the risk factors for HIV and the manner in which HIV is transmitted, one would think the potential sexual partner of an intravenous drug user bearing needle marks and showing signs of any kind of illness would, if not run for the nearest exit, insist on precautions against possible transmission of HIV.

Second, the majority's hypothetical example conflates reason to know that one is at higher risk of infection with reason to know that one is HIV positive. The drug user in the majority's hypothetical would certainly have reason to know he was at higher risk of infection but not necessarily that he was infected with HIV. As I understand the majority, a person who is in possession of knowledge that he or she is at higher risk of HIV infection would not be liable for the negligent transmission of HIV based on a theory he or she had reason to know he or she was HIV positive. If this is not the case, then the majority should be clear about what type of liability it is creating with this new tort.

The majority's rejection of an actual knowledge standard as a predicate for imposing liability for transmitting HIV also flies in the face of the Legislature's adoption of an actual knowledge standard in statutes that penalize the transmission of the virus. Health and Safety Code section 120291 makes it a felony, punishable by up to eight years in state prison, for a person to "expose[] another to . . . [HIV] by engaging in unprotected sexual activity when the infected person *knows* at the time of the unprotected sex that he or she is infected with HIV, has not disclosed his or her HIV-positive status, and acts with the specific intent to infect the other person with HIV." (Health & Saf. Code, § 120291, subd. (a), italics added.)[6] Health and Safety Code section 1621.5 also makes it a felony, punishable by up to six years in prison, "for any person to donate blood, body organs or other tissue, semen . . . , or breast milk . . . who *knows* that he or she has acquired immune deficiency syndrome, as diagnosed by a physician and surgeon, or who *knows* that he or she has tested reactive to HIV." (Health & Saf. Code, § 1621.5, subd. (a), italics added.) Finally, Penal Code section 12022.85 imposes a three-year sentence enhancement on any person who commits a specified sexual offense "with *knowledge* that he or she has acquired immune deficiency syndrome (AIDS) or with the *knowledge* that he or she carries antibodies of the human immunodeficiency virus at the time of the commission of those offenses." (Pen. Code, § 12022.85, subd. (a), italics added.)

The Legislature's use of an actual knowledge standard in statutes that criminalize the transmission of HIV is significant and instructive. The Legislature has not hesitated to impose criminal penalties based upon constructive as well as actual knowledge when it has deemed constructive knowledge sufficient to warrant liability. (See, e.g., Pen. Code, § 245, subd. (c) [assault with a deadly weapon or instrument, other than a firearm, upon a victim whom the perpetrator "knows or reasonably should know . . . is a peace officer or firefighter engaged in the performance of his or her duties"]; *id.*, subd. (d) [same, for assault with a firearm]; *id.*, § 12022.9 [imposing a five-year enhancement for an injury inflicted during the commission of a felony upon a victim whom the perpetrator "knows or reasonably should know . . . is pregnant"].) Yet, despite the Legislature's greater expertise dealing with the AIDS epidemic, it has not adopted a constructive knowledge standard in statutes criminalizing the transmission of AIDS. Rather, the Legislature has recognized, through its educational and public information initiatives, that the responsibility for preventing the spread of HIV must rest

---

[6] Yet even a defendant accused of this offense does not lose all of his or her privacy rights with respect to information about his or her HIV status. Health and Safety Code section 120292 permits disclosure of such information only with a court order and only after the court has "weigh[ed] the public interest and the need for disclosure against any potential harm to the defendant, including, but not limited to, damage to the physician-patient relationship and to treatment services." (Health & Saf. Code, § 120292, subd. (a)(2).)

primarily with sexually active individuals precisely because the virus may be unknowingly and unwittingly transmitted. Therefore, I conclude that the Legislature's use of an actual knowledge requirement in these penal statutes reflects a legislative judgment that a constructive knowledge standard is not appropriate for purposes of imposing civil liability for the transmission of HIV.

The majority asserts that the Legislature's use of an actual knowledge standard in these criminal statutes "in no way suggests that the Legislature intended to depart from Civil Code section 1714 or from ordinary negligence principles in a *civil* action for negligent transmission of HIV." (Maj. opn., *ante*, at pp. 1196–1197, fn. omitted.) This assertion is consistent with the majority's decision to ignore the unique nature of the AIDS epidemic and minimize the implications of legislative policy judgments with respect to the epidemic as reflected in the large body of AIDS law. The Legislature, much more than this court, has a long history of responding to the epidemic and doing so with an expertise this court cannot command in service of the goal of reducing HIV infection. Plainly, if the Legislature believed that a constructive knowledge standard was workable and would help achieve that goal it would not have hesitated to include that standard in the HIV penal statutes, just as it has adopted a constructive knowledge standard in other penal statutes where it deemed the use of such a standard necessary to protect the public safety. Thus, the Legislature's decision *not* to use a constructive knowledge standard, but to premise criminal liability for the transmission of HIV on actual knowledge only, cannot be dismissed as irrelevant to the discussion of civil liability which, in effect, is what the majority has done.

Finally, I am concerned that the creation of this new tort is also inconsistent with the Legislature's policy of guarding against the conflation of transmission of HIV with sexual orientation in a way that stigmatizes one of the populations most vulnerable to infection. This legislative solicitude is demonstrated, for example, in Health and Safety Code section 120292, which governs disclosure of HIV records in criminal investigation. In that statute, the Legislature has specifically provided that a court order for such records "shall not be based on the sexual orientation of the defendant." (*Id.*, § 120292, subd. (a)(1).) In this same vein, the Legislature has mandated that AIDS education in public schools include "[d]iscussion about societal views on HIV/AIDS, including stereotypes and myths regarding persons with HIV/AIDS. This instruction shall emphasize compassion for persons living with HIV/AIDS." (Ed. Code, § 51934, subd. (b)(7).) Thus, in adopting AIDS policy, the Legislature has been sensitive to the need to separate the public health issues raised by the AIDS epidemic from the prejudice AIDS has generated toward some of its victims. The majority does not similarly consider whether and what impacts its creation of this new tort might have on the populations most vulnerable to infection.

For these reasons, I dissent from the majority's creation of a cause of action for negligent transmission of HIV based on a constructive knowledge standard. I would find that civil liability for transmission of the virus must be predicated upon actual knowledge of infection. This result would be consistent with the Legislature's painstaking formulation of a comprehensive policy to combat the AIDS epidemic.

By contrast, the majority's result is inconsistent with legislative policy. The majority allows a person who tests HIV positive to bring an action against all former sexual partners and attempt to ascertain not only whether they had actual knowledge they were HIV positive when they engaged in sexual relations but also whether they had any "reason to know" they were HIV positive.[7] This cause of action potentially licenses invasions into the sexual privacy of all sexually active Californians and may even invite abuse of the judicial process. One can easily foresee a spate of "shakedown" or vengeance lawsuits brought by plaintiffs whose motivation is not so much to discover how they contracted HIV as to force lucrative settlements or embarrass a former sexual partner by exposing that person's sexual history in the guise of obtaining relevant discovery. Even without this potential for abuse, the threat to the confidentiality of HIV test results and to sexual privacy, the apparent absence of any scientific grounding for a constructive knowledge standard, and the potential for stigmatization of individuals based on their sexual orientation are powerful arguments against this novel theory of liability for the negligent transmission of HIV. I understand that the majority is guided by the commendable goal of preventing transmission of HIV and AIDS, but creating this new tort is not the way to go about it. Instead, with this decision the majority has opened a Pandora's box. For these reasons, I respectfully but emphatically dissent.

[7] The majority's suggestion that its holding applies only to "a couple who were engaged and subsequently married" (maj. opn., *ante*, at p. 1193) is no real limitation given that the duty analysis that precedes this statement makes no distinction between married couples and everyone else.